## UNITED STATES, Appellee

v

## GIUSEPPE M. DITERLIZZI, Airman Third Class, U. S. Air Force, Appellant

### 8 USCMA 334, 24 CMR 144

No. 9744

Decided October 25, 1957

*Major Dwight R. Rowland* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel R. W. Dech*.

*Captain John W. Fahrney* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Major John M. Rankin*.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This is an appeal from a denial by the law officer of a defense motion for a mistrial.

The accused was tried for operating a motor vehicle without a license, in violation of a general order, and for causing the death of three persons alleged to be passengers in a car driven by him in a culpably negligent manner, in violation of Article 119 of the Uniform Code of Military Justice, 10 USC § 919. He was convicted of negligent homicide, in violation of Article 134,

334

10 USC § 934, and of violating a general order.

At the trial the prosecution first established that shortly after midnight on June 3, 1956, on the autobahn which led to Munich, a 1952 Mercedes passed Lt. Cavello's car on a curve. The Lieutenant testified that he was driving at approximately 60 to 70 kilometers per hour,[1] and the Mercedes was proceeding at about twice his speed. Parenthetically it should be noted that there is no posted speed limit on the autobahn. Three or four minutes later on an exit road from the autobahn he came upon the same car. It had smashed into a pole on the side of the exit road. Two persons were lying on the ground near the car and three others were caught in the wreckage in the back seat.

For its second witness the prosecution called an air policeman. He testified that he appeared at the scene at about 1:30 a. m. He ascertained who had driven the Mercedes by asking the accused if "he was the driver of the vehicle, which he admitted." Defense counsel objected to this testimony on the ground that the accused had not been advised of his rights under Article 31, Uniform Code, 10 USC § 831. Trial counsel argued that the air policeman's investigation was "routine," and, consequently, no advice on the rights of an accused under the Article was required. The law officer overruled the objection. On further examination, however, the witness testified he knew at the time he questioned the accused there was a "good possibility" that a court-martial would result from the accident. In his redirect examination he also admitted that he was "getting the statement for later court-martial action." Thereupon, trial counsel moved to strike the accused's admission from the record and that the court be instructed to disregard it. Defense counsel joined in the motion, which was granted by the law officer. The law officer also instructed the court to disregard the evidence. Defense counsel then moved for a mistrial on the ground that the stricken

[1] A kilometer is approximately 5/8th's of a mile.

evidence related to an "extremely important" issue, and the court could not shut it out from "their minds" despite "all instructions." This motion was denied.

In ruling on the motion the law officer pointed out that he did not know what further testimony would be brought out by the prosecution so the motion was not "well taken at this time." At that point two members of the court questioned the earlier ruling striking the accused's admission from the record. The law officer advised the court members it was "a very close question of law," but he had concluded the evidence was inadmissible. He specifically asked one of the questioning members whether he could disregard the evidence. The member replied, "Certainly I can."

Through photographic exhibits and the testimony of witnesses, the prosecution later showed that the ill-fated Mercedes had a left-hand drive. It had rammed into a steel light pole in such a way as to split open completely the right side of the car from the front end to the rear wheel. The light pole was bent, but it did not break and it protruded from about the center of the car. The doors on the left side remained substantially intact. Within a minute after the collision, Dr. Ewald Pfisterer, a German dentist, arrived on the scene. The Mercedes had passed him at an estimated speed of 100 kilometers "shortly before" he got on the exit road. The posted speed on the exit road is 50 kilometers per hour.

At the scene of the collision, Dr. Pfisterer found five persons. The accused was "slumped" in the driver's seat; three persons were in the rear of the car; one hung out of the right side and appeared to be dead; the other two were still alive. Next to the car at its right front was a dead man. The witness removed the accused from the driver's seat and the man on the left side of the rear seat. The man in the middle of the rear seat could not be extricated; he died about twenty minutes later. According to Dr. Pfisterer, a strong odor of alcohol emanated from the vehicle.

Shortly after the collision, three persons taken from the scene of the accident, were examined by Dr. C. H. Dudley, an Air Force medical doctor, and were pronounced dead. About the same time Dr. Dudley examined the accused. He found superficial abrasions on his face. The accused did not appear to be "too well orientated." His pulse was weak and rapid, which indicated the possibility of shock, and he was vomiting blood. Dr. Dudley ordered the accused transported to a general hospital for further examination.

On behalf of the accused it was shown that he purchased the Mercedes on May 31. He had no license to drive a private automobile as was required by regulation, and he was informed that his application for a driver's license would not be approved. Consequently, according to the accused, he had no "intention" to operate the car off the base.

On the afternoon of June 2, an Airman Keegan asked the accused for the loan of his car. The accused acceded to the request and gave Keegan written authorization to use the car together with the registration for the car. In the early evening the accused met Keegan in a town about a mile and a half from the air base. The two went to a bar where the accused had "a double shot." Later, they proceeded to Munich in the accused's car with Keegan driving. In Munich they went to the Rumba Bar. There, the accused engaged in a brief conversation with a Sergeant Clegg. Clegg asked the accused whether he had driven the car to Munich, and he received a negative answer. The accused also "saw" two airmen who were later killed in the collision, but he maintained that he could not recall whether they left the bar with him. That contention is the core of the accused's defense.

Testifying in his own behalf, the accused steadfastly maintained that he could recall walking out of the Rumba Bar on the night of June 2, 1956, near closing time, but he could not remember anything thereafter until he awakened in the hospital a few days later. He "guess[ed]" that Airman Keegan (who

was one of those killed in the collision) was with him at the time he left the bar because "he had the car; we were supposed to stay together," but the accused could not recall "going to the car." As he put it, "I cannot say that I was and I cannot say that I wasn't" driving the car at the time of the accident. However, he doubted that he was the driver because he "did not want to drive." Dr. Dudley testified that when he examined the accused after the accident, the accused told him that he had been in an accident, but he could not say where he had been in the car. At an undisclosed time after the accident, a Sergeant Williams interrogated the accused in connection with it. He advised the accused as to his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. The accused told him that he had been drinking in the afternoon and in the evening of the day of the accident, but he did not know how much. The accused also said that he did not know who had been driving the car.

The final matter which merits mention is the content of the examination of the accused by one of the court members who had earlier questioned the law officer's ruling. The important part of the examination is as follows:

"Q: . . . since the time of the accident have you had the opportunity to talk to a lot of people about the accident?
A: Yes, sir, I did.

. . . . .

"Q: In your conversation with various people, did anybody intimate to you that you might be in a bad spot because of the accident, that you might be in trouble because of the accident?
A: Well, there is quite a few people know it.
"Q: Did they say it looks like you might be in a bad spot because of the accident?
A: Yes, sir, they did.

• • • • •

"Q: Did anybody at any time suggest to you that it might be convenient to you not to remember anything because of the accident?

A: No, sir, they did not.

"Q: Did anybody tell you it might be hard to prove you had anything to do with the accident?

A: No, they did not say either one of these things."

The circumstances in this case are substantially like those in United States v Harris, 8 USCMA 199, 24 CMR 9. There, as here, a pretrial admission by the accused was brought to the attention of the court members. On the motion of defense counsel, the evidence was ordered stricken from the record, and the court members were admonished to disregard it. The accused then moved for a mistrial, but the motion was denied by the law officer. We held that the ruling was erroneous. We pointed out that the inadmissible evidence concerned the only important issue in the case and that the law officer's instruction to disregard it could not "wipe out the harm already done," especially since it appeared that at least one member of the court was reluctant to accept the ruling striking the evidence from the record.

Here, the evidence of the accused's guilt, especially as to negligence, is entirely circumstantial. As in the Harris case, some of the court members were obviously reluctant to accept the ruling striking the accused's pretrial admission from the record. Moreover, one of them indicated by his questioning that he entertained a strong doubt of the truthfulness of the accused's testimony. In our opinion, there is a fair risk that this doubt was at least in part due to the influence of the accused's pretrial admission. It also seems to us that the discrepancy between the accused's testimony and his earlier statement would influence the court members in drawing adverse inferences from the circumstantial evidence. We conclude, therefore, that the motion for a mistrial should have been granted.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

This Court has followed the general civilian practice in assuming that "sound judicial administration requires that a lion's share of such errors [erroneously admitted evidence] be regarded as fully reparable through proper instructions." United States v O'Briski, 2 USCMA 361, 8 CMR 161; United States v Patrick, 8 USCMA 212, 24 CMR 22.

Assuming arguendo that in this instance there was improperly introduced into evidence a pretrial admission of the accused, the law officer ordered the evidence stricken from the record. When one member sought further instructions, the law officer specifically asked him whether he could disregard this evidence. The member answered, "Certainly I can." From the immediate action taken by the law officer and from the answer received, I am convinced that any irregularity was purged forthwith.

But in any event, when all the Government's evidence is considered in the backdrop of this record, I am convinced that the questionable evidence would have no impact on the findings of the court-martial members, for there was no real dispute in the facts and, unless the laws of nature have been repealed, the accused had to be the driver. The three persons riding in the rear were found in their seats, either dead or injured, and the passenger in the front was so badly injured he could not move. The accused was injured, he was removed from under the driver's wheel immediately after impact, and that space only became unoccupied after his removal. In the light of this evidence, I would affirm the decision of the board of review.