UNITED STATES, Appellee

v

MICHAEL L. TEMPIA, Airman Third Class, U. S. Air Force, Appellant

16 USCMA 629, 37 CMR 249

639

No. 19,815

April 25, 1967

*Major Frank W. Lane, Jr.,* argued the cause for Appellant, Accused. With on the brief was *Colonel Joseph Buchta.*

*Lieutenant Colonel David B. Stevens* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

*Colonel J. E. Hanthorn,* USMC, and *Commander Walter F. Brown,* USN, were on *amicus curiae* brief.

*John J. Flynn, Esquire,* and *Roger W. Kaufman, Esquire,* were on *amicus curiae* brief.

## Opinion of the Court

FERGUSON, Judge:

This case, certified by the Judge Advocate General, United States Air Force, presents important questions concerning the administration of military justice. Basically, it inquires whether the principles enunciated by the Supreme Court in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), apply to military interrogations of criminal suspects. We hold that they do. As to cases tried on and after June 13, 1966, the doctrine set forth in our earlier decision in United States v Wimberley, 16 USCMA 3, 36 CMR 159, has largely been set at naught by the *Miranda* decision.[1]

I

The accused was tried by general court-martial at Dover Air Force Base, Delaware, and convicted of taking indecent liberties with females under the age of sixteen, in violation of Uniform Code of Military Justice, Article 134,

10 USC § 934. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for six months, and reduction. Intermediate appellate authorities affirmed, and the case was, as indicated above, certified to this Court on the question:

"WAS THE BOARD OF REVIEW CORRECT IN ITS DETERMINATION THAT THE ACCUSED'S PRETRIAL STATEMENT WAS PROPERLY RECEIVED IN EVIDENCE?"

The accused's trial commenced on June 14, 1966, one day after the effective date of applying the principles set forth in *Miranda*, supra. See Johnson v New Jersey, 384 US 719, 16 L ed 2d 882, 86 S Ct 1772 (1966). The testimony of the witnesses therein disclosed the following evidence.

On May 1, 1966, accused accompanied an Airman Keitel to the base library. Upon request, Keitel pointed out the location of the latrine. Ac-

---

[1] Immediately after the decision of the Supreme Court in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), was promulgated, the Department of the Air Force directed all Air Police agencies to comply with its mandate until the question could be resolved here. We commend this due attention to the rights of an accused.

cused left Keitel in the reading room and returned in five or six minutes.

From other testimony, it appears he went to the ladies' rest room, stood in its partially opened door, and made obscene proposals to three young girls. The victims left the library, returned with one of their parents and the Air Police, and pointed accused out in the reading room. Accused was asked "to come back to the office" by one of the policemen. He did so.

At the Air Police office, accused was advised by Agent Blessing that he was suspected of taking indecent liberties with children; of his rights under Code, supra, Article 31, 10 USC § 831; and " ' "that you may consult with legal counsel if you desire." ' " Agent McQuary assisted Agent Blessing in the interview. It was immediately terminated, as Tempia stated " 'he wanted counsel.' " He was released from custody.

On May 3, 1966, Tempia was again called to the "OSI Office" where he was once more advised by Blessing, in the presence of Agent Feczer, of his rights and entitlement to consult with counsel. Accused " 'stated he had not yet received legal counsel.' " Blessing thereupon called Major Norman K. Hogue, Base Staff Judge Advocate, and made an appointment for Tempia.

Blessing's interview with Tempia terminated at 8:50 a.m., and the latter proceeded to Major Hogue's office. Hogue informed him he was the Staff Judge Advocate and "that I could not accept an attorney-client relationship with him because if I did, it would disqualify me from acting in my capacity as Staff Judge Advocate." He further stated to Tempia that he would nevertheless "advise him of his legal rights and explained to him that this was different than acting as his defense counsel in that I did not want to hear any of his story, but I would answer any legal questions he had after I explained some rights to him."

Major Hogue also told accused he could not make a military lawyer available to him "as his defense counsel during that OSI investigation," but

632

that he had the right to employ civilian counsel; would be given a reasonable time to do so; and that civilian counsel would be entitled to appear with him at the investigation. In addition, Hogue advised him of his rights under Code, supra, Article 31, and explained those rights to him, but:

". . . As I say, I told him no military lawyer would be appointed to represent him during the OSI investigation or any investigation by the law enforcements agents on this base. I told him that if charges are preferred—in his case, referred to trial by special court-martial or general court-martial, where it's referred to an investigation under Article 32b, he would be furnished a military lawyer at that time, one certified under Article 27b of the Uniform Code of Military Justice."

In addition, accused filled out a written form in which it was indicated he had been advised:

a. That he had the right to retain civilian counsel at his own expense;

b. That no military lawyer would be appointed to represent him while under investigation by law enforcement agents;

c. That he would be furnished military counsel if charges were preferred and referred to trial or a pretrial investigation convened;

d. Of his rights under Code, supra, Article 31;

e. Of the maximum punishment involved; and,

f. That he had not discussed his guilt or innocence or any of the facts involved with Major Hogue.

Following his session with Major Hogue, Tempia returned to the Office of Special Investigations, at 9:24 a.m. He "was then called in . . . readvised of his rights, readvised of the nature of the investigation and of his rights to seek legal counsel the second time." He stated he had consulted with Major Hogue, and did not desire further counsel as "they could not help him. . . . He said, 'They didn't do me no good.' " Thereafter, he was in-

terrogated by Blessing and Feczer, to whom he began to dictate his confession.

At the trial, defense counsel sought exclusion of the statement on the basis of the Supreme Court decision in *Miranda,* supra, as he had found it reported in the press. The law officer overruled his timely objection and admitted Tempia's confession in evidence.

## II

The Judge Advocate General, United States Navy, has filed a brief *amicus curiae* in which it is urged that military law is in nowise affected by constitutional limitations and, in consequence, that the principles enunciated in Miranda v Arizona, supra, do not apply to the situation herein presented. The Government, however, takes a different tack. Conceding the application of the Constitution, it urges the Supreme Court has no supervisory power over military tribunals. Construing Miranda v Arizona, supra, as announcing only procedural devices designed to enforce a Constitutional right in the exercise of the Supreme Court's supervisory power, it contends this Court is neither required to follow *Miranda,* supra, nor are its stringent formulae necessary or desirable in the administration of military justice. In this latter connection, it adverts to our decision in United States v Wimberley, supra, and points to the safeguards erected by Congress in Code, supra, Article 31.

Counsel for the accused and other *amicus curiae* (who represented *Miranda* before the Supreme Court) disagree; point out that the decision in *Miranda,* supra, was one of constitutional dimensions; and, therefore, urge it is binding on military interrogations.

The time is long since past—as, indeed, the United States recognizes—when this Court will lend an attentive ear to the argument that members of the armed services are, by reason of their status, *ipso facto* deprived of all protections of the Bill of Rights.

Military jurisprudence is and has always been separated from the ordinary Federal and State judicial systems in this country. Such is the meaning of Mr. Chief Justice Vinson's language in Burns v Wilson, 346 US 137, 97 L ed 1508, 73 S Ct 1045 (1953), at page 140:

"Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress."

That military law exists and has developed separately from other Federal law does not mean that persons subject thereto are denied their constitutional rights. To the contrary, the very issue before the Supreme Court in Burns v Wilson, supra, was whether such a denial had occurred. The Chief Justice, in an opinion in which three other justices concurred (two dissenting justices would have gone further and ordered additional examination of the facts below), pointed out: "The federal civil courts have jurisdiction over such applications." He then went on to state the duty of this Court and that of every other judicial body inferior to it:

"The military courts, like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights."

Mr. Justice Minton, concurring in the result, likewise declared it was our duty to correct errors of constitutional magnitude. Mr. Justice Frankfurter, while opting for reargument of the case, nevertheless had no doubt that the military is "not freed from the requirements of due process of the Fifth Amendment." Burns v Wilson, supra, at page 149.

The impact of Burns v Wilson, supra, then, is of an unequivocal holding by the Supreme Court that the protections of the Constitution are available to servicemen in military trials. The issue on which the Court divided was not the applicability of constitutional rights but the scope of collateral review by the Federal courts—"the manner in which the Court should proceed to exercise its power." Burns v Wilson, supra, at page 139.

We likewise have not been remiss in stating our obligation to protect a serviceman's rights under the Constitution. In United States v Jacoby, 11 USCMA 428, 29 CMR 244, we expressly said, at page 430:

". . . [I]t is apparent that the protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces. Burns v Wilson, 346 US 137, 73 S Ct 1045, 97 L ed 1508 (1953); Shapiro v United States, 107 Ct Cl 650, 69 F Supp 205 (1947); United States v Hiatt, 141 F2d 664 (CA 3d Cir) (1944)."

And while the Judges separated in United States v Culp, 14 USCMA 199, 33 CMR 411, as to the reasoning behind the ultimately unanimous holding that an accused before a special court-martial was not entitled, as a matter of right, to legally qualified counsel, all agreed on the question of the applicability of the Bill of Rights.

Thus, Judge Kilday said, at page 206:

"I agree, thoroughly and completely, with the view that members of the military are not shorn of their constitutional rights while they remain in the military service. Blackstone said:

'. . . he puts not off the citizen when he enters the camp; but it is because he is a citizen, and would wish to continue so, that he makes himself for a while a soldier.' (1 Blackstone, Commentaries (Wendell ed), page 408.)"

The Chief Judge noted, at page 216:

"It has long been my position that service personnel 'are entitled to the rights and privileges secured to all under the Constitution of the United States, unless excluded directly or by necessary implication, by the provisions of the Constitution itself.'"

To the foregoing, I added my belief "that the Sixth Amendment, insofar as it pertains to the right of counsel, applies in trials by court-martial." United States v Culp, supra, at page 219.

Thus, it will be seen that both the Supreme Court and this Court itself are satisfied as to the applicability of constitutional safeguards to military trials, except insofar as they are made inapplicable either expressly or by necessary implication. The Government, therefore, is correct in conceding the point, and the Judge Advocate General, United States Navy, as *amicus curiae*, is incorrect in his contrary conclusion. Indeed, as to the latter, it would appear from the authorities on which he relies that the military courts applied what we now know as the constitutional protection against self-incrimination in trials prior to and contemporaneous with the adoption of the Constitution. Hence, we find Major Andre being extended the privilege at his court-martial in 1780. Wigmore, Evidence, 3d ed, § 2251. The same reference was made in the trial of Commodore James Barron in 1808. Proceedings of the General Court Martial Convened for the Trial of Commodore James Barron (1822), page 98. And, the Articles of War of 1776, as amended May 31, 1786, provided for objection by the judge advocate to any question put to the accused, the answer to which might tend to incriminate him. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 196, 972.

The point need not, however, be belabored. Sufficient has been said to establish our firm and unshakable conviction that Tempia, as any other member of the armed services so situated, was entitled to the protection of the Bill of Rights, insofar as we are herein concerned with it. We pass,

therefore, to the Government's contention that *Miranda, supra,* involves a decision in the area of the Supreme Court's supervisory authority rather than constitutional principles.

### III

At the outset, we must note that the Government's contention misapprehends the extent of the Supreme Court's supervisory authority over the administration of criminal justice. It goes no further than the bounds of the Federal judicial system. *Miranda, supra,* was a State case, prosecuted in the courts of Arizona, as were two of its companion cases, Vignera v New York, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), and California v Stewart, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966). The Court sought not, directly at least, to supervise criminal trials in those States, but to determine whether the utilization of confessions in those hearings violated the privilege of the Fifth Amendment which, in Malloy v Hogan, 378 US 1, 12 L ed 2d 653, 84 S Ct 1489 (1964), "we squarely held . . . applicable to the States, and held that the substantive standards underlying the privilege applied with full force to state court proceedings." *Miranda, supra,* at page 463.

A cursory scrutiny of the opinion in *Miranda* makes crystal clear that the formulae there laid down ▄▄▄▄▄ ▪ by the Court are constitutional in nature, although the door was left open for the legislative process to innovate "other procedures which are *at least as effective* in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." (Emphasis supplied.) *Miranda, supra,* at page 467. Thus, the Court noted, at the outset, it had "granted certiorari in these cases . . . to explore some facets of the problems, thus exposed, of applying the privilege against self-incrimination to in-custody interrogation, and to give concrete *constitutional guidelines* for law enforcement agencies and courts to follow." *Id.,* at page 441. (Emphasis supplied.) It spoke not of the exercise of its supervisory authority over the Federal judicial system,

but of the "constitutional issue"; "adequate safeguards to protect precious Fifth Amendment rights"; "whether the privilege is fully applicable during a period of custodial interrogation"; "the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation"; "the issues presented are of constitutional dimensions"; and of similar matters, all indicative of the fact, hardly to be gainsaid, that the Court was laying down constitutional rules for criminal interrogation which are part and parcel of the Fifth Amendment.

Moreover, if the matter was not clearly made apparent in *Miranda, supra,* it was settled beyond cavil in the subsequent case of Johnson v New Jersey, *supra.* The Court there repeatedly referred to the new standards as "constitutional rules of criminal procedure," the "prime purpose" of which "is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice." *Id.,* at pages 727, 728, 729. Accordingly, we cannot accept the Government's ingenious argument that *Miranda, supra,* does not deal with constitutional principles and, hence, may be rejected by this Court, in light of the safeguards with which a military accused has heretofore been protected. As the Chief Judge has noted, the views of "the Supreme Court of the United States on constitutional issues" are binding on us. United States v Armbruster, 11 USCMA 596, 598, 29 CMR 412, 414. Moreover, I am in full accord with Judge Kilday's views as set forth in his separate opinion herein.

### IV

We turn, therefore, to the merits of the controversy before us. Miranda v Arizona, supra, explicitly ▄▄▄▄ ▪ and at length lays down concrete rules which are to govern all criminal interrogations by Federal or State authorities, military or civilian, if resulting statements are to be used in trials commencing on and after June 13, 1966. We commend a reading of that opinion to all involved

in the administration of military criminal law as well as the undertaking of educative measures to see that its precepts are not violated in pretrial interrogations. While we here intend no definitive treatment of the manifold questions which may arise in this connection, we quote the Supreme Court's summary of what must be done:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has

consulted with an attorney and thereafter consents to be questioned." [Id., at page 444.]

We now proceed to examine the facts presented in this record, in light of the foregoing requirements.

a. *Custodial Interrogation.*

The Government urges upon us the proposition that the accused was not in custody, and, hence, the ▪ need for appropriate advice and assistance did not arise. We may at once dispose of this contention. The accused was apprehended on May 1, 1966; freed to seek counsel; recalled for interrogation on May 3, 1966; an appointment was made for him with Major Hogue, following which, he immediately returned to the Office of Special Investigations, where his interrogation was successfully completed. The test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been "otherwise deprived of his freedom of action in any significant way." *Miranda,* supra, at page 444. Here, the accused was clearly summoned for interrogation. Had he not obeyed, he would have undoubtedly subjected himself to being penalized for a failure to repair. Code, supra, Article 86, 10 USC § 886; Manual for Courts-Martial, United States, 1951, paragraph 127b. In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action. See People v Kelley, 57 West's Cal Rptr 363, 424 P2d 947 (1967). Hence, we conclude there was "custodial interrogation" in this case.

b. *The Warning.*

The accused was fully advised of his rights under Code, supra, Article 31, and of his right to consult ▪ with counsel. On indicating a desire to speak with counsel, he was initially freed and, ultimately, on May 3, was referred to

Major Hogue for further advice concerning his rights. But that officer went no further than to emphasize to the accused that he could not form an attorney-client relationship with him; to advise him again of his rights under Code, supra, Article 31; and to inform him he could retain civilian counsel at his own expense, who could appear at his interrogation. He specifically told accused no military lawyer would be appointed "to represent him during the OSI investigation or any investigation by the law enforcement agents on this base."

*Miranda*, supra, squarely points out "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, *either retained or appointed.*" (Emphasis supplied.) In addition, if the accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."

Undoubtedly, the advice given Tempia under Code, supra, Article 31, sufficed to inform him both of his right to remain silent and the purpose for which any statement he might make could be used. The advice as to counsel, however, was deficient.

First, accused was only warned by the agents that he was entitled to consult with counsel. When Major Hogue elaborated on this proposition, he limited the availability of counsel to private attorneys employed by the accused at his own expense. He specifically told accused no attorney would be appointed to represent him in any law enforcement investigation. This is exactly contrary to the information which, under *Miranda*, supra, must be preliminarily communicated to the accused. In the words of the Supreme Court, at page 472:

"If an individual indicates that he wishes the assistance of counsel before any interrogation occurs, the authorities cannot rationally ignore or deny his request on the basis *that the individual does not have or cannot afford a retained attorney. The financial ability of the individual has no relationship to the scope of the rights involved here.* The privilege against self-incrimination secured by the Constitution applies to all individuals. The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. In fact, were we to limit these constitutional rights to those who can retain an attorney, our decisions today would be of little significance. The cases before us as well as the vast majority of confession cases with which we have dealt in the past involve those unable to retain counsel. While authorities are not required to relieve the accused of his poverty, they have the obligation not to take advantage of indigence in the administration of justice. Denial of counsel to the indigent at the time of interrogation while allowing an attorney to those who can afford one would be no more supportable by reason or logic than the similar situation at trial and on appeal struck down in *Gideon* v *Wainwright*, 372 US 335 (1963), and *Douglas* v *California*, 372 US 353 (1963).

"In order fully to apprise a person interrogated of the extent of his rights under this system then, *it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him.* Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain

**637**

silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." [Emphasis supplied.]

As accused was informed no counsel would be appointed for him, it follows that the statement thereafter taken from him was inadmissible in evidence.

### c. *Waiver.*

The Government suggests that accused knowingly and intelligently waived his rights against self-incrimination by making his statement after being repeatedly warned under Code, supra, Article 31, and subjecting himself to further interrogation following his conference with Major Hogue. In connection with the latter circumstance, it invites our attention to testimony that, on returning from Hogue's office, accused stated he did not desire further counsel, "that they could not help him. . . . 'They didn't do me no good.'"

Aside from the fact that accused was improperly advised as to his entitlement to appointed counsel, we point out that he, in fact, received no legal advice, as Major Hogue specifically declined to act as his attorney. The testimony, taken as a whole, indicates not that accused did not desire a lawyer's services but that he had been frustrated in obtaining advice on whether to exercise his rights—hence, his comment: "'They didn't do me no good.'" There should be small wonder at his feelings, when he had just been refused the opportunity to discuss the case with Hogue, relate any of the facts to him, or to obtain any information as to a desirable course of action. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda,* supra, at page 475.

Quite apart from the insufficiency of the warning as to accused's right to

counsel, here the Government did not carry its burden, and no waiver is made out. To the contrary, it merely shows accused's entitlement to consult with counsel was frustrated by the Staff Judge Advocate's well-meant but legally improper statements.

Finally, the Government urges it cannot be required in law to furnish appointed counsel for accused during law enforcement investigations. Referring to language in our earlier decision in United States v Gunnels, 8 USCMA 130, 23 CMR 354, and interpreting it to mean that one is not entitled to appointed counsel prior to the reference of charges for investigation, it points out that no money has ever been appropriated for providing counsel at an earlier time. Monies, it states, which have been appropriated by the Congress must be used for the purpose intended. See 31 USC § 628. Hence, it argues that counsel paid from such funds may not be used as such earlier than was originally intended, *i.e.,* at the initial investigation of charges.

We must confess an inability to follow out the intricacies of this argument. Undoubtedly, Congress provides funds for the payment of defense counsel, but we know of no prohibition in appropriation acts, the Uniform Code of Military Justice, or the Manual for Courts-Martial, United States, 1951, against such being made available to the accused when he is initially interrogated by police officers. Indeed, the impact of *Miranda,* supra, upon the administration of military justice should be far less than that in comparable civilian jurisdictions. The armed services are already provided with a complete, functioning system of appointed counsel, one which, in *Miranda,* supra, merited the approbation of our highest court. In most cases, defense counsel will eventually have to be appointed for the trial. All that will now be required is that the date of appointment be moved back. And should the investigation result in no trial, we daresay that the consequent savings will more than repay any costs involved in the earlier intervention of an appointed counsel.

Be that as it may, we point out an-

other matter overlooked in the Government's claim of lack of authority to furnish counsel on this earlier occasion. *Miranda,* supra, does not specifically require such procedures or their equivalent to be followed. It merely prohibits the receipt in evidence of any statement taken, unless there is compliance with these constitutional standards. If the Government cannot comply with them, it need only abandon its reliance in criminal cases on the accused's statements as evidence. That is the essence of the *Miranda* holding, and it is the choice of the Government whether to pay this price for withholding counsel at the critical moment of police interrogation.

Turning to the views of our dissenting brother, we cannot agree that the procedures heretofore employed in the armed services are the equivalent of the interrogation rules laid down in *Miranda,* supra. Were such the case, we would, of course, agree that Tempia's conviction should be affirmed, as, considering his statement, there is no doubt of the case against him. The question, however, is whether his confession was obtained in accordance with appropriate constitutional safeguards so that it became admissible in evidence. That it was not, and could not be under the principles laid down in *Miranda,* supra, is illustrated not only above but in the following comments.

Thus, following our decision in United States v Gunnels, 8 USCMA 130, 23 CMR 354, this Court has repeatedly pointed out the accused is not entitled to appointed military counsel during the investigative process, but must furnish an attorney at his own expense. Absent that, he must be content with hearing a recitation of his rights under Code, supra, Article 31, 10 USC § 831, from the Staff Judge Advocate. United States v Wimberley, supra, and cases collected therein. Moreover, his attorney, even when privately furnished, was not allowed, prior to *Miranda,* to be present during the accused's interrogation, though accused had the right to consult with him. Indeed, in United States v Wimberley, supra, at page 10, the Chief Judge, speaking for the Court, declared:

". . . We are not persuaded, however, that the right to counsel must be extended to include the investigative processes. . . . Nothing in the Uniform Code, supra, or in the decisions of this Court, . . . indicate that the only feasible way to give maximum effect to the Constitutional right to the assistance of counsel is that the accused have counsel beside him during police questioning."

In the same case, we held explicitly that a statement "is admissible in evidence, even though the accused is not informed he has the right to consult counsel during the questioning." *Wimberley,* supra, at page 10. Since Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), we have found that warning to be a common practice in the United States Air Force. Indeed, it was given in this case, but it becomes meaningless when, as here, the right to counsel is then interpreted to mean only individually hired attorneys and the Staff Judge Advocate's role is limited to a reiteration to the accused of his rights under Code, supra, Article 31.

Again we find ourselves at odds with our brother's interpretation of *Miranda,* supra, in this area. The essence of his view seems to be that this landmark holding and that in *Escobedo,* supra, is limited to seeing an accused or suspect is advised of his right to rely upon his constitutional privilege. But, as those cases make clear, it is equally or more important for him to know when to speak and when to remain silent. Hence, the Supreme Court held that, under the Fifth and Sixth Amendments, he was entitled to an attorney —not a supposedly impartial arbiter who will later judge whether accused is to be prosecuted, but a lawyer who is peculiarly and entirely the accused's own representative; who owes him total fidelity; to whom full disclosure may be safely made in a privileged atmosphere; and from whom accused can learn with confidence a proper course of action. Otherwise, if the accused makes statements, the trial may well be over when he leaves the station house or, though innocent, his frantic concern for his own

**639**

safety may lead him so to constrict himself by a series of damaging declarations that an entirely valid defense may later be set at naught. There are many considerations—apparent to any trial lawyer worth his salt—which may govern an accused's choice of action when in the hands of the police. The latter are always free to call upon the state's attorney or Staff Judge Advocate for advice regarding their investigative tactics. The Supreme Court has now established parity by demanding the accused likewise be furnished a legal advisor of his own—not one who is duty bound also to weigh the interests of the Government; who cannot protect the accused with the attorney-client privilege; and to whom, as here, he cannot relate the facts as he saw them and secure competent advice as to what course to follow.

Thus, it will be seen our brother errs in concluding that our procedures heretofore followed are the equal of those now required under the Constitution by the decision in Miranda v Arizona, supra. Now, the accused must have a lawyer; before, he need not have been given one; now, he must be warned of his right to counsel; before, he need not be so warned; and, now, finally, he will receive effective legal advice not only as to what he can do, but also as to what he should do.

Finally, we need not dwell at length on the Chief Judge's interpretation of the accused's comment, "he did not desire legal counsel, that they could not help him." Well might the accused believe the "jig was up" after he could get no advice from the Staff Judge Advocate; could tell him none of the facts; and could merely sit and listen to a repetitious statement of his rights under Article 31. He wanted a counsel, not an impartial arbiter. He received only the latter. *Miranda*, supra, requires the former.

In sum, we are not persuaded by our brother's views that we have anticipated the Supreme Court in this area, nor that the military picture is as rosy as he paints it. What does concern us is our duty to follow the interpretation by the Supreme Court of the Constitution of the United States insofar as it is not made expressly or by necessary implication inapplicable to members of the armed forces. It is well to remember that we, "like the state courts, have the same responsibilities as do the federal courts to protect a person from a violation of his constitutional rights." Burns v Wilson, supra, at page 142. We necessarily must effectuate that mandate by holding Miranda v Arizona, supra, applicable in military prosecutions.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

KILDAY, Judge (concurring):

I concur with Judge Ferguson in his disposition of the certified issue. Additional comment, however, is, to my mind, desirable. In my view, were the Supreme Court to consider the case at hand, it would, I believe, unhesitatingly declare the advice afforded Tempia as falling far short of those minimum constitutional requirements enumerated in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966).

Initially, I point out that in *Miranda* the Supreme Court construed and applied the Fifth and Sixth Amendments to the Constitution of the United States. It, in a not too common procedure, laid down what, in future cases, is to be regarded as providing minimum constitutional guarantees to one being interrogated as to the commission of a crime. Being of "constitutional dimension," Miranda v Arizona, supra, must be assessed accordingly.

In United States v Smith, 13 USCMA 105, 32 CMR 105, this Court considered at length the application in military law of a decision of the Supreme Court establishing a rule of evidence for civilian practice. Cf. Opper v United States, 348 US 84, 99 L ed 101, 75 S Ct 158 (1954). In *Smith*, a majority of this Court held that in view of paragraph 140a, Manual for Courts-Martial, United States, 1951, and in pursuance of authority granted him by Article 36, Uniform Code of Military Justice, 10

USC § 836, the President had provided a different rule of evidence for the military on the question of corroboration of an out-of-court statement of an accused as to the *corpus delicti.*

The *Smith* case serves to point out the very material difference between *Miranda, Opper,* and *Smith.* The latter two cases are concerned only with a rule of evidence, whereas, *Miranda* constitutes a holding as to a constitutional minimum to be applied in both State and Federal courts. See Act of June 29, 1940, 54 Stat 688, Title 18, United States Code, granting the Supreme Court power to prescribe rules of pleading, practice, and procedure, and Rules 26 and 27 of the Federal Rules of Criminal Procedure for United States District Courts, adopted by the Supreme Court under the authority of Congress, last above-cited. In *Miranda,* the Supreme Court was dealing with a case arising in the State courts of Arizona rather than a United States District Court. Thus, it is clear the Supreme Court was applying constitutional provisions and not establishing a rule of evidence or procedure in accordance with its statutory powers.

The decision of the Supreme Court on this constitutional question is imperatively binding upon us, a subordinate Federal court, and we have no power to revise, amend, or void any of the holdings of *Miranda,* even if we entertained views to the contrary or regarded the requirements thereof as onerous to the military authorities.

We are, however, obliged to accord this decision full faith and credit. To do so, we must necessarily face constitutional issues forthrightly, realizing full well that "[w]hen a case has been decided by this Court, appellate review has terminated." At the same time we cannot be unmindful that decisions of this Court may in turn restrict subsequent review by the Supreme Court. United States v Culp, 14 USCMA 199, 33 CMR 411.

Article 76,[1] Uniform Code of Military Justice, 10 USC § 876, notwithstanding, it has long been obvious that court-martial proceedings are open to examination by civil courts. Initially, they were limited to jurisdictional questions founded upon habeas corpus proceedings. Deemed reviewable were questions going to the composition of courts-martial, to jurisdiction over the person or subject matter, or to whether a sentence was authorized by law. Jurisdiction was also said to exist in order to determine if a sentence was so severe as to offend against the constitutional prohibition against cruel and inhuman punishment. McClaughry v Deming, 186 US 49, 46 L ed 1049, 22 S Ct 786 (1902) ; Ex parte Reed, 100 US 13, 25 L ed 538 (1879) ; Carter v McClaughry, 183 US 365, 46 L ed 236, 22 S Ct 181 (1902) ; Collins v McDonald, 258 US 416, 66 L ed 692, 42 S Ct 326 (1922) ; Benjamin v Hunter, 169 F2d 512 (CA 10th Cir) (1948) ; Hunter v Wade, 169 F2d 973 (CA 10th Cir) (1948), 8 ALR2d 277, affirmed, 336 US 684, 93 L ed 974, 69 S Ct 834, rehearing denied, 337 US 921, 93 L ed 1730, 69 S Ct 1152 (1949) ; Flackman v Hunter, 75 F Supp 871 (D Kan) (1948), appeal dismissed without opinion, 173 F2d 899 (CA 10th Cir) (1949) ; Glenn v Hodges, 79 F Supp 400 (SD NY) (1948) ; Richardson v Zuppann, 81 F Supp 809 (MD Pa) (1949) ; State v Mills, 82 Okla Crim 155, 163 P2d 558 (1945), rehearing denied, 82 Okla Crim 155, 167 P2d 669 (1946) ; Kinsella v United States, 361 US 234, 4 L ed 2d 268, 80 S Ct 297 (1960) ; Grisham v Hagan, 361 US 278, 4 L ed 2d 279, 80

---

[1] "The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharges carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive. Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74) and the authority of the President."

S Ct 310 (1960) ; McElroy v Guagliardo, 361 US 281, 4 L ed 2d 282, 80 S Ct 305 (1960) ; Reid v Covert, 354 US 1, 1 L ed 2d 1148, 77 S Ct 1222 (1957).

The scope of such review has, in recent years, been extended to queries regarding an accused's constitutional rights. Burns v Wilson, 346 US 137, 97 L ed 1508, 73 S Ct 1045 (1953) ; Gusik v Schilder, 340 US 128, 95 L ed 146, 71 S Ct 149 (1950). This may involve due process and specific constitutional guarantees. In United States v Hiatt, 141 F2d 664, 666 (CA 3d Cir) (1944), that court first pointed out that basic guarantees of fairness afforded by the due process clause of the Fifth Amendment applied to a defendant in a criminal proceeding in a military court. It thereupon concluded, "it is open for a civil court in a habeas corpus proceeding to consider whether the circumstances of a court-martial proceeding and the manner in which it was conducted ran afoul of the basic standard of fairness which is involved in the constitutional concept of due process of law and, if it so finds, to declare that the relator has been deprived of his liberty in violation of the fifth amendment and to discharge him from custody."

In Gallagher v Quinn, et al., Judges of the United States Court of Military Appeals, 363 F2d 301 (CA DC Cir) (1966), certiorari denied, 385 US 881, 17 L ed 2d 108, 87 S Ct 167, that court affirmed an order of the District Court dismissing a complaint for a mandatory injunction and other relief to compel the Judges of this Court to again review, on the merits, the record of Gallagher's court-martial conviction. Although sustaining this Court's decision on the constitutional question there involved, the Circuit Court concluded that the District Court had jurisdiction, as a matter of due process, to review the procedure under the Uniform Code of a person shown to have been convicted but who was no longer in custody. The Court of Appeals, at pages 303 and 304, observed:

". . . though greater latitude respecting due process is allowed military tribunals, due process is

requisite. Burns v Wilson, *supra* n. 2. And the right to due process would be lost if one deprived of it could not obtain redress because not in confinement.

"The Supreme Court is the final arbiter of due process under the Constitution. The Supreme Court has not been granted jurisdiction to review either on direct appeal or by certiorari a decision of the Court of Military Appeals. The consequence is that unless jurisdiction lies in the District Court in such a case as this, with appellate jurisdiction in this court and then in the Supreme Court, the constitutional validity of the Act of Congress cannot be decided except by the military tribunal. The 'separate and apart' military law jurisprudence, referred to in those terms in Burns v Wilson, *supra* n. 2, at 140, would appear not to be separated so far from possible Supreme Court scrutiny."

Compare, too, Ashe v McNamara, 355 F2d 277 (CA 1st Cir) (1965). The court there considered such fundamental unfairness in court-martial procedure as a denial of effective assistance of counsel.

See, also, Shapiro v United States, 107 Ct Cl 650, 69 F Supp 205 (1947). In that case it was said that the Fifth and Sixth Amendments applied to military tribunals as well as civil courts.

It is sound judicial policy that there be orderly termination of all litigation. If lacking, neither the system nor the parties are afforded any conceivable benefit. An accused may be saddled with an unpardonable burden both personal and monetary. The harm thus wrought may in some cases be irretrievable. Even under more fortunate circumstances the toll can be immeasurable.

In this regard, I am mindful that the decision, noted above, of the United States Court of Appeals, First Circuit, in Ashe v McNamara, favoring that appellant, was rendered some seventeen years after he had been dishonorably discharged from the naval service pursuant to a sentence by a general court-

martial. This Court had dismissed his petition for review, for lack of jurisdiction, on July 24, 1964 (15 USCMA 703).

Similarly, the Court of Claims decision in Shapiro v United States, also above-cited, is shown to have been published in January 1947, almost four years after a 1943 court-martial conviction.

Shaw v United States, 357 F2d 949 (1966), is an action in the United States Court of Claims to recover back pay and allowance on the ground of a wrongful dismissal from the naval service. His petition to this Court for review was also dismissed for lack of jurisdiction on July 10, 1953 (3 USCMA 851). Judgment favored the plaintiff eleven years after his 1948 court-martial for, under the facts of the case, his conviction of embezzlement was declared constitutionally unwarranted.

Where we possess jurisdiction, it is my desire to ensure the future against such happenings. I am satisfied that in this we can be certain only by assessing each case, as it appears before us, with vigor and fidelity, never narrowing our scope of appellate inquiry.

To summarize, I can but again reiterate my certainty that this Court is bound by the Supreme Court on questions of constitutional import; that our actions in this area are reviewable by civil tribunals; that any other view adopted by us raises the specter of possible harm to an accused with no lasting benefit to the Government; and that finality of litigation occurs only if we face every such issue squarely.

QUINN, Chief Judge (dissenting):

A good case can be made to show that Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), was not intended by the Supreme Court to apply to the military legal system. The Supreme Court especially pointed out that an "understanding of the nature and setting" of the kind of in-custody interrogation it was concerned with was "essential" to its decision. It illumined and analyzed interrogation techniques that were "psychologically . . . oriented" to deprive the individual of the free and unfettered choice to speak or to remain silent. *Id.*, at pages 445, 448. In United States v Wimberley, 16 USCMA 3, 10, 36 CMR 159, however, this Court observed that its experience with the conditions and methods of military interrogations indicated they did not tend to override or interfere with the individual's exercise of the right to remain silent. Perhaps even more significant than the factual underpinning of *Miranda* is the approbation accorded the military interrogative procedure by the Supreme Court.

The central purpose of *Miranda* was to effectuate the Fifth Amendment right of the individual to remain silent. To achieve that purpose, the Supreme Court deemed it necessary to adopt certain "protective devices" to nullify the "inherent compulsions of the interrogation process as it is presently conducted." *Id.*, at pages 458, 467. The devices adopted by the Court were patterned on safeguards in effect in other jurisdictions. Among these jurisdictions was the United States military. The Supreme Court commented on the procedure to safeguard the right to remain silent, which had been prescribed by Congress in Article 31 of the Uniform Code of Military Justice, 10 USC § 831, and further delineated by this Court in United States v Gunnels, 8 USCMA 130, 23 CMR 354, and United States v Rose, 8 USCMA 441, 24 CMR 251. It reasoned that "at least as much protection" of the right to remain silent should be accorded to individuals in the civilian community. *Miranda,* at page 489. It seems to me that this esteem for the military practice was expressed in *Miranda* only because the Supreme Court was satisfied it provided effective counterbalance to the inherent pressures of in-custody interrogation, and assured the individual complete freedom to decide whether to speak or to remain silent.

Assuming, however, I read too much into the praise accorded the military system in *Miranda,* I am convinced that the military procedures to safeguard the right to remain silent are, within the framework of *Miranda,* "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will

**643**

be scrupulously honored." The Supreme Court expressly disclaimed any intention that *Miranda* operate as "a constitutional straightjacket" of preconditions to in-custody interrogation. It expressly acknowledged that means other than those prescribed by it may be equally effective to safeguard the right. And, it expressly reaffirmed that a confession is admissible in evidence against the accused when demonstrated to have been "given freely and voluntarily without any compelling influences." *Id.,* at pages 479, 467, 478. I am satisfied that the means provided by Congress in the Uniform Code to safeguard the accused's right to remain silent satisfy all constitutional requirements; to demand more, as the majority do, is to legislate, not adjudicate.

Military law starts with a safeguard not mentioned in *Miranda,* Article 31 of the Uniform Code, supra, requires that, before any questioning, the individual be informed of the "nature of the accusation" which prompts the proposed questioning. Thus, the individual is immediately and directly oriented to the purpose of the interrogation, and is better able to determine whether to speak or to remain silent. United States v Johnson, 5 USCMA 795, 803, 19 CMR 91. Next, for many years military law has required, as *Miranda* interpreted the Fifth Amendment to require, that, before questioning, the individual be specifically informed "he has the right to remain silent," and if he chooses to speak, anything he says can be used against him in court. *Id.,* at page 479; United States v Williams, 2 USCMA 430, 9 CMR 60; see also United States v Diterlizzi, 8 USCMA 334, 24 CMR 144. The third safeguard devised by the Supreme Court deals with advice to the individual as to the right to counsel in connection with the interrogation. My brothers maintain the military procedure does not match *Miranda* in this area. I pass the point for the moment to note the correspondence between the military procedure, and the fourth and

final procedural safeguard promulgated by *Miranda. Miranda* postulated that the opportunity to exercise the right to remain silent and the right to consult counsel "must be afforded . . . throughout the interrogation." *Id.,* at page 479. Military law imposes a continuous duty upon law enforcement agents to accord that right to the individual being questioned. United States v Dickson, 16 USCMA 392, 37 CMR 12; United States v Evans, 13 USCMA 598, 33 CMR 130; cf. United States v Rogers, 14 USCMA 570, 34 CMR 350.

I turn now to the alleged difference between the mandate of *Miranda* and the requirements of military law. *Miranda* held that one of the minimum safeguards to assure the individual in an in-custody situation the unfettered choice between speech and silence is that he be advised he "has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.,* at page 479.

Anticipating *Miranda,* and its precursor, Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), this Court held that an accused has the right to the presence of counsel throughout interrogation by law enforcement officials. United States v Gunnels, supra, at page 134. It did not, as *Miranda* does, impose an obligation upon the agents to advise the individual explicitly that he has a right to counsel. United States v Wimberley, supra.[1] However, at least since *Escobedo,* it has been common practice in the Air Force to provide such preliminary information. In fact, the accused in this case was affirmatively and fully informed he had a right to counsel and his lawyer could be with him during any interrogation. This part of the counsel safeguard expounded in *Miranda* was thus honored in fact, although it had not yet been posited by *Miranda* as a requirement to assure that the in-

---

[1] As pointed out in United States v Wimberley, 16 USCMA 3, 36 CMR 159, our experience with military investigative processes did not indicate the additional safeguard of appointed military counsel was essential to assure that the individual understood his right to remain silent and that he was absolutely free to exercise the right as he desired.

dividual knows the nature of his right to remain silent and that he is free to exercise it as he chooses. That brings us to the second part of the *Miranda* formula which is to advise the individual that if he "cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." In my opinion, military law provides the individual an equivalent, if not a greater, safeguard; and that safeguard was accorded the accused in this case.

*Miranda* postulated that the circumstances of in-custody interrogation "can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators." It, therefore, concluded that a "once-stated warning, delivered by those who will conduct the interrogation," was insufficient to assure the right to choose between silence and speech. *Id.*, at page 469. As a counterweight to the coercive influences of the in-custody interrogation, the Supreme Court determined that the individual was entitled to the assistance of counsel at the station house. Military procedure deals with the problem differently. It cuts off, abruptly and completely, the entire station house atmosphere. In its place it substitutes the dignity, the prestige, and the independence of the staff legal officer. Instead of a lawyer appointed by his interrogators, which itself may engender suspicion and fear, the individual is accorded the opportunity to consult the senior military legal officer of his command, or his representative, at a place removed from the interrogation site. United States v Gunnels, supra, at page 134. Instead of a "once-stated warning" by the interrogator, the individual discusses his right to remain silent with an impartial legal authority. And the legal officer is duty bound to advise the individual fully as to his right to remain silent and the means available to him to exercise the right. *Gunnels*, at page 138. Taking into account the individual's education, intelligence, and ability to understand English, the staff legal officer must be certain the individual understands that the law gives him the absolute right to face his interrogators and tell them, bluntly and immediately, that he does not want to talk.

See United States v Hernandez, 4 USCMA 465, 16 CMR 39.

I fully appreciate that, in advising the accused in an interrogative situation, the staff legal officer does not act as a lawyer for the accused in the sense of the conventional attorney-client relationship. I do not, however, regard the absence of the conventional relationship as a defect in the military procedure. As I view the interrogation situation, the only advice any lawyer can give the individual is that if he keeps silent he will give the police nothing they can use against him, but if he talks whatever he says can be used against him. That is precisely the counsel the staff legal officer gives him. And, it seems to me, the impact of his advice upon the individual is greater than the probable impact of similar advice by a lawyer appointed through the efforts of the individual's interrogators.

The staff legal officer is *the* legal authority of the command, and his advice as to the dictates of the law is rarely disregarded by military persons within his jurisdiction. Consequently, if we consider operative psychological influences, as *Miranda* indicates we may, the legal officer's advice on the right to remain silent is likely to make a deeper and more lasting impact upon .the individual than the advice given him at the station house by a lawyer secured by his interrogators. I am, therefore, convinced that according the individual faced with in-custody interrogation the right to consult the staff legal officer, or a legal member of his office, is fully as effective a safeguard of the right to remain silent, as informing the individual that if he "cannot afford an attorney one will be appointed for him . . . if he so desires." That opportunity was extended to, and accepted by, the accused. He was allowed to leave the Office of Special Investigations to go, at his own time and at his own convenience, to consult the Base Staff Judge Advocate. In fact, he consulted with the Staff Judge Advocate, and was provided with a complete oral and written explanation of the right to remain silent, the right to have counsel present during the interrogation if he desired,

and the maximum punishment for the offenses under investigation. I conclude that the procedures followed in this case satisfied every demand of *Miranda* for effective assurance that the accused knew and understood how he could exercise the right to remain silent.

One final comment is necessary. The majority refer to the accused's remarks on returning to the Office of Special Investigations. Agent Feczer's testimony thereon is as follows:

"DC: Mr. Feczer, did Airman Tempia, upon returning to the OSI office after speaking with Major Hogue, decline legal counsel, or did he say he was unable to obtain legal counsel to represent him at the interrogation?

"A: Sir, the way he put it, he did not desire legal counsel, that they could not help him. This is the statement that he gave us.

"Q: That the military could not help him.

"A: Well, he didn't say 'military.' He said, 'They didn't do me no good.'"

The majority interpret the accused's statement to indicate he had apparently despaired of obtaining legal advice from the Base Staff Judge Advocate, and they conclude the accused was given no advice. In my opinion, the majority misconstrue the statement. The accused did not testify, so the record does not indicate the meaning he personally attributed to it; but as I read the testimony of the agent, he interpreted the comments as indicating the accused had concluded the "jig was up" so no one, not even lawyers, could help him. Before his apprehension, the accused had been identified at the place of the offense by each of his victims. I echo the majority's remark, "small wonder at his feelings"; but for a different reason.

On the evidence in this record, I cannot avoid the conclusion that when the accused returned to the Office of Special Investigations he knew and fully understood his right to remain silent. He returned to the office determined to speak. He had been caught practically "redhanded" and there was no way out; but he could perhaps gain a measure of leniency by immediate cooperation with the police. *Miranda* does not proscribe a confession in such circumstances. On the contrary, it explicitly acknowledges "[t]here is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime." *Id.*, at page 478.

I would answer the certified question in the affirmative, and I would sustain the decision of the board of review.