UNITED STATES

v.

**Timothy Mark RICE, 016 48 6649, Aviation Electronics Technician Airman (E–3), U. S. Navy.**

**NCM 77 0625.**

U. S. Navy Court of Military Review.

Sentence Adjudged 15 Dec. 1976.

Decided 7 Sept. 1977.

CAPT Eugene A. Ritti, USMCR, Appellate Defense Counsel.

CAPT Mark M. Humble, USMCR, Appellate Government Counsel.

Before CEDARBURG, C. J., and ROOT and GREGORY, JJ.

GREGORY, Judge:

Appellant was tried by a general court-martial military judge, sitting alone. Contrary to his pleas of not guilty, he was convicted of willfully destroying military property and larceny of this same property, in violation of Articles 108 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 908, 921. He was sentenced to a dishonorable discharge, confinement at hard labor for 3 years, forfeiture of $200 per month for 3 years, and reduction to pay grade E–1. The convening authority reduced the duration of confinement and forfeitures to 2 years, but otherwise approved the sentence.

A brief summary of the facts surrounding this case is helpful. On 7 September 1976, expensive electronic components were discovered missing from an F–14 aircraft in a hangar at Naval Air Station, Oceana, Virginia Beach, Virginia. These items were integral components of the AWG–9 Weapons Control System of the F–14 aircraft and were valued at $450,820. The four boxes which had housed the electronic components were found abandoned in a lake in Virginia Beach on 11 September 1976, with most of the electronic parts missing from the boxes. Appellant had been detailed as a roving patrol sentry in the hangar during watches on 4 and 5 September 1976 and had been assigned to guard the aircraft later discovered to be minus the electronic components. As part of their investigation into this matter, agents of the Naval Investigative Service (NIS) interviewed appellant on 8, 15, and 20 September 1976. These agents indicated that appellant did not become a suspect in the theft until midway in the interview on 20 September 1976. Only at this point were appropriate warnings given appellant by the investigating agents. Appellant then made incriminating statements regarding his involvement. Immediately thereafter appellant requested counsel, and a Lieutenant Commander H. Troy Nicks, JAGC, USN, was made available to represent him. Appellant was placed in telephone contact with Lieutenant Commander Nicks, who advised appellant not to speak further with NIS. The NIS agents were also made aware of this advice by Lieutenant Commander Nicks. No more questioning of appellant occurred. Shortly after this telephone conversation, however, the NIS agents requested that appellant consent to a search of his car and his off-base apartment. Appellant requested and received permission to speak to his counsel once again. However, Lieutenant Commander Nicks had departed his office in the interim, and appellant was unable to reach him. The investigating agents then renewed their request for consent to search, which appellant granted. Incriminating evidence was found in the trunk of appellant's automobile in the form of a pair of pliers which tests indicated had been used to cut wires inside the boxes recovered from the lake.

Appellant has assigned the following errors before this Court:

I. IN SELECTING THE MEMBERS FOR APPELLANT'S COURT, THE CONVENING AUTHORITY FAILED TO COMPLY WITH ARTICLE 25(d)(2) OF THE CODE, THEREBY DEPRIVING THE COURT OF JURISDICTION.

II. THE JUDGE ERRED IN ADMITTING INTO EVIDENCE STATE-

MENTS TAKEN FROM APPELLANT IN VIOLATION OF HIS ARTICLE 31 RIGHTS.

III. IN THE COURSE OF OBTAINING APPELLANT'S ALLEGED CONSENT TO SEARCH, NIS VIOLATED APPELLANT'S SIXTH AMENDMENT AND ARTICLE 27 RIGHTS TO COUNSEL.

IV. THE SENTENCE IS INAPPROPRIATELY SEVERE.

We find merit only in Assignment of Error IV.

## I

At trial, appellant moved to dismiss the charges against him on the basis that the members appointed to sit in his case had been selected in violation of the Sixth and Fourteenth Amendments to the United States Constitution, as well as in violation of Article 25, Uniform Code of Military Justice. After this motion was denied, appellant elected to be tried by military judge alone. [R. 10]. On appeal, appellant renews his arguments that the Sixth and Fourteenth Amendments were violated because there was no "rational basis" for excluding persons whom the convening authority believed unqualified under Article 25, and also argues that Article 25 itself was violated because the convening authority did not "personally determine" which persons were best qualified to serve on the court.

The court members in this case were selected and appointed pursuant to COMFIVE/COMNAVBASE Norfolk Instruction 5810.5J. This instruction requires that various commands in the Norfolk area nominate officers of a designated grade to serve as prospective court members for a 6-month period. The instruction could lead to possible nominees in all officer grades below flag rank, and it directs the various commands "to ensure that their nominees are qualified for such duty by reason of age, education, training, experience, length of service, and judicial temperament (Article 25, UCMJ)." The nominees were then divided into two panels by the staff judge advocate to the convening authority.

The procedures established by the instruction are considered to be consistent with Article 25. Although appellant does not appear to contest this point, he contends that these procedures are still constitutionally infirm because there is no "rational basis" for excluding those persons whom the convening authority deems unqualified. He indicates that this process excludes enlisted personnel and many junior officers from potential assignment, and fails to provide for a true random selection of court members from an array of qualified personnel.

With respect to appellant's arguments based on the Sixth Amendment, we find no support for such a proposition. A similar argument was presented to the Court of Military Appeals in *United States v. Kemp,* 22 U.S.C.M.A. 152, 46 C.M.R. 152 (1973), and it was held:

Courts-martial are not a part of the judiciary of the United States within the meaning of Article III of the Constitution. *Ex parte Quirin,* 317 U.S. 1, 86 L.Ed. 3, 63 S.Ct. 1–2 (1942). They derive their authority from the enactments of Congress under Article I of the Constitution, pursuant to congressional power to make rules for the government of the land and naval forces. Consequently, the Sixth Amendment right to trial by jury with accompanying considerations of constitutional means by which juries may be selected has no application to the appointment of members of courts-martial. [*Id.* at 154, 46 C.M.R. at 154].

The Court of Military Appeals has recently acknowledged that any changes in the current selection process for court-martial members will have to be as the result of action by the Congress. *United States v. McCarthy,* 25 U.S.C.M.A. 30, 35, n. 3, 54 C.M.R. 30, 35, n. 3, 2 M.J. 26, 29, n. 3 (1976).

With respect to appellant's contention that the Fourteenth Amendment [1] has been violated, the exact focus of his complaint is not clear. It appears appellant is complaining that he was denied "due process" because he was treated differently from other accused persons. If this is the case, there is nothing in the record of trial to indicate appellant was treated any differently from any other accused in the selection of members for his court-martial. These particular members apparently had been made available to act as court-martial members for a 6-month period. *Cf. United States v. Crawford*, 15 U.S.C.M.A. 31, 35 C.M.R. 3 (1964). If appellant is, instead, alleging a denial of "due process" in the sense that statutory procedures were not properly followed in the selection of members, then this complaint can be treated together with the following discussion of the alleged violation of Article 25, U.C.M.J.

■ As the final thrust of his attack on jurisdiction, appellant alleges that the convening authority did not "personally determine" the qualifications of the members of the court. Article 25(d)(2) provides, *inter alia*:

> When convening a court-martial, *the convening authority shall detail* as members thereof such *members* of the armed forces *as, in his opinion,* are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. [Emphasis added].

Appellant argues that the convening authority improperly delegated his responsibility in this regard to his subordinate commanders.

We are unable to adopt appellant's reasoning in this regard. The record of trial indicates that the convening authority in this case directed his subordinate commanders to nominate officers from a broad range of ranks, using the qualification criteria of Article 25(d)(2) as a guide. The nominations were then broken down into two proposed panels by a member of the convening authority's staff, his staff judge advocate. Thereafter, the convening authority made the final selection by means of a convening order, presumably prepared for his signature by his staff.

The selection procedures followed in this case are widely used throughout all of the military services. Such procedures are no different from those which have been previously approved in *United States v. Kemp* and *United States v. Crawford,* both *supra. Also see United States v. Owens,* 27 C.M.R. 658 (A.B.R.1959). We do not find that the convening authority delegated his Article 25 responsibilities. Rather, he merely made reasonable use of his subordinate commanders and the members of his staff to carry out the nomination process. This did not prevent the convening authority from discharging his duty to "select" members whom he believed most qualified, as there is certainly no indication that the convening authority was in any way bound by his subordinates' recommendations. *See United States v. Angeles,* 49 C.M.R. 90 (N.C.M. R.1974).

We find no lack of jurisdiction in this case.

### II

Appellant complains that a pretrial statement was obtained from him in violation of his rights under Article 31, U.C.M.J. Specifically, he alleges that he was interrogated without benefit of Article 31 warnings, even though he was already suspected of having committed an offense. On the other hand, the Government argues that, prior to the time he was warned, appellant was not "suspected" within the terms of Article 31 and for this reason warnings were not required.

As noted previously, appellant was questioned on three occasions by NIS agents. He was finally warned in accordance with Article 31 and *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), at a midpoint of the third session. The facts

---

1. In view of the federal forum, we assume appellant intended the Fifth Amendment. *See*   *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

developed in an evidentiary hearing at trial reveal that the electronic components were discovered missing on Tuesday, 7 September 1976, following the 3-day Labor Day weekend. A massive investigative effort was mobilized by NIS, concentrating their efforts on what had taken place over a time span of roughly 72 hours. NIS interviewed some 79 watchstanders from the Labor Day weekend, including appellant, plus eight members of a corrosion control team who had worked in the hangar during this period of time. No warnings were given to any of the persons interviewed. Appellant was first interviewed on 8 September 1976. In this interview, appellant stated he had a hangar watch on Saturday afternoon and Sunday morning; he recalled seeing open avionics panels on two aircraft, with four boxes in one of the aircraft and three empty spaces in the other; and he indicated that he was familiar with AWG–9 equipment.

The NIS agents testified that no leads or suspects were developed from their interviews on 8 and 9 September. Their investigative efforts continued, and the four missing boxes were discovered on 11 September. Several latent fingerprints were lifted from one of the boxes. NIS decided to reinterview all of the watchstanders plus the corrosion control team and to fingerprint each of them. This process was accomplished on 15 and 16 September, and again no warnings were given to the persons interviewed. Three of the interviews provided useful information and helped reduce the timeframe. ATAA Tiams, who had been hospitalized and not interviewed previously, recalled having a hangar watch from 0000 to 0400 on Sunday, 5 September, and noticing an aircraft with its avionics panel open and the AWG–9 boxes removed. He assumed the boxes had been removed for maintenance. AOAN Van Dyke recalled having the watch with appellant from 1200 to 1600 on Saturday, 4 September, and the two of them looking at an F–14 with a panel open. He indicated there were three or four boxes in that panel and one box had a tag "AWG–9". AOAN Van Dyke also stated appellant came up to him the following Tuesday or Wednesday and mentioned the aircraft they had been looking at was the one that now had the boxes missing. ATAN Rice, the appellant, was also interviewed on 15 September. This interview took place at appellant's apartment, since he was off-duty. Appellant was not fingerprinted, because the NIS agents did not bring their fingerprinting equipment with them. During this interview, appellant recalled standing in front of the aircraft with AOAN Van Dyke. He indicated that he may have touched one of the boxes, so he would not consider it unusual if his fingerprints were on the front of one of the boxes. When asked about his increased memory over the last interview, appellant stated that the incident had been a general topic of conversation around the squadron and this had caused him to recall more about his watch on Saturday.

NIS now decided to reinterview the watchstanders and corrosion control personnel who had been in the hangar from 1200, 4 September, to 0400, 5 September. This was scheduled for Monday, 20 September 1976. The first person called in was a member of the corrosion control team. Because he had a reputation in the squadron for "violence and erratic behavior," he was considered a "suspect" and was warned prior to interrogation. Nothing significant was produced by the interrogation. Next, two other watchstanders were interviewed, with no productive results. Finally, appellant was called in and interviewed by Special Agents McGady and Bradley. Appellant reiterated what he had disclosed in his previous interviews. He then added that he had turned the handle on one of the boxes to show AOAN Van Dyke how the boxes are held in place and how they can be removed. He indicated he had not disengaged or removed any of the boxes. The NIS agents then remembered that appellant had not been fingerprinted, so this was accomplished. Special Agent McGady testified that appellant then seemed to become a "little nervous and flushed", so he asked appellant if there was something appellant wanted to tell him. When appellant indi-

cated there was not, Special Agent McGady asked him if there was anyplace else his fingerprints might be on the boxes. Appellant apparently thought for awhile and then indicated his prints could also be on the bottoms and sides of the boxes. At this point, Special Agent McGady halted the interview and left the room to talk to Special Agent Schmitt who had interviewed appellant on 15 September. Special Agent Schmitt indicated to Special Agent McGady that appellant had not previously disclosed turning the handle on one of the boxes. Special Agent McGady then returned to the interview room and changed the interview to an interrogation. Appellant was advised he was a "suspect" and was advised of his various rights in this regard. Appellant waived his various rights. Appellant continued to deny his involvement for a short period of time. Mr. Schmitt then took over the questioning, and appellant shortly thereafter admitted taking the boxes containing the electronic components. [R. 17–18, 50].

■ We do not concur in appellant's contention that he had become a "suspect" and had already provided incriminating information to Special Agent McGady prior to being advised of his Article 31 rights. On the basis of the factual scenario set out above, we concur in the special finding of the military judge that appellant did not become a "suspect" until after he told Special Agent McGady that he had turned the handle on the AWG–9 gear and that it was possible his fingerprints might be found on other than the front of the gear.

The Court of Military Appeals has several times indicated that the determination of whether one is suspected of an offense for purposes of the applicability of Article 31 is to be made on the basis of an objective standard. The facts and circumstances of each case, viewed objectively, determine if an accused is, at the time of questioning, a "suspect" and entitled to warnings concerning self-incrimination. The facts of the various cases which have confronted the Court, however, indicate that the questioner in each instance denied any suspicion of an

offense, that the Court first applied a subjective standard, and that the Court in then applying the objective standard rejected the testimony of the questioner when found to be incredulous. See, e. g., United States v. Graham, 21 U.S.C.M.A. 489, 45 C.M.R. 263 (1972); United States v. Anglin, 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969); United States v. Doyle, 9 U.S.C.M.A. 302, 26 C.M.R. 82 (1958). Application of this course of action is demonstrated in United States v. Collier, 49 C.M.R. 719, 724 (A.F.C.M.R.1975), reversed on other ground, 1 M.J. 358 (1976), wherein the Court of Military Appeals makes clear that the threshold question is "Did the questioner suspect the accused of an offense?" If the answer to this initial inquiry is negative, the facts as known to the questioner at the critical time are examined and the inquiry becomes, "Should the questioner have reasonably suspected the accused of an offense?" Accord United States v. Tibbetts, 54 C.M.R. 135, 1 M.J. 1024 (Interim) (N.C.M.R. 1976).

In the case of this appellant, the NIS agents state that they did not suspect him of an offense prior to his indication that he had turned the handle and his fingerprints might be found elsewhere than on the front of the AWG–9 boxes. We believe there is reasonable basis for this stance on the part of the NIS agents. Appellant had been interviewed on two prior occasions, 8 and 15 September. However, these interviews produced nothing to cause a suspicion that appellant had removed the AWG–9 boxes; they only alerted the NIS agents that appellant had material information concerning the time frame when they disappeared. When appellant's interview on 20 September commenced, there was reasonable basis still to consider him only a material witness who could possibly corroborate AOAN Van Dyke's recollection that they had seen the gear in place on 4 September. The fact that appellant had candidly admitted touching the front of the gear and that he may have been one of the last persons to see the missing boxes did not make him any more of a suspect than the other watchstanders and corrosion control personnel known to

have access to the hangar during the narrowed time frame.

In summary, we find that appellant was not reasonably suspected of any offense until he related his turning of the handle and the possible additional location of his fingerprints. Upon receipt of this information, Special Agent McGady provided appropriate warnings before any further questioning ensued. We find that the military judge correctly denied the defense motion to suppress the incriminating statements made by appellant to NIS investigators on 20 September 1976. *See United States v. Henry*, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971), and *United States v. Schafer*, 13 U.S.C.M.A. 83, 32 C.M.R. 83 (1962).

### III

As noted previously, appellant gave his consent for the NIS investigators to search his automobile and his off-base apartment. The search of the automobile yielded a pair of pliers which laboratory tests by the Federal Bureau of Investigation indicated had been used to cut wires in the recovered AWG-9 boxes. Appellant's consent to the search came after he had expressed an interest in discussing the matter with his counsel, Lieutenant Commander Nicks. The NIS agents, who had ceased their questioning at Lieutenant Commander Nicks' direction, gave appellant an opportunity to telephone his counsel. When appellant was unable to reach Lieutenant Commander Nicks because he was out of his office, the NIS agents renewed their request and received appellant's consent. At trial and on appeal, appellant has contended that the obtaining of the consent to search by the NIS agents violated appellant's right to effective assistance of counsel, relying on *United States v. McOmber*, 1 M.J. 380 (1976).

*McOmber* concerned a reinterrogation of an accused by investigators without consulting his counsel. The Court of Military Appeals found the issue to be:

Succinctly stated, the concern is whether an attorney once appointed or retained to represent a military suspect must first be contacted by investigators who have notice of such representation when they wish to *question* the suspect. [*Id.* 1 M.J. at 382]. [Emphasis supplied].

The Court held in very clear terms:

If the right to counsel is to retain any vitality, the focus in testing for prejudice must be readjusted where an investigator *questions* an accused known to be represented by counsel. We therefore hold that once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further *questioning* of the accused without affording counsel reasonable opportunity to be present renders any *statement* obtained involuntary under Article 31(d) of the Uniform Code. [*Id.* 1 M.J. at 383]. [Emphasis supplied].

We view the thrust of *McOmber* to be directly against further questioning of an accused and to be intended to preserve the accused's right against self-incrimination. Appellant argues that the *McOmber* rule is broader and embraces any effort to thwart an already existing attorney-client relationship, and would extend to a request for an accused's consent to search. We would be willing to concede that the search would have been illegal in this case, if the NIS agents had attempted to prevent our appellant from seeking the advice of his counsel. However, the facts do not support such a conclusion. The only evidence on this point was provided by the NIS agents who had been questioning appellant and who obtained the appellant's consent to search. The record of trial indicates that appellant had not been reluctant to grant permission for the search but felt that he might want to talk to his counsel about the search. [R. 85]. Appellant was apparently given ample opportunity to contact his counsel and to make any other telephone calls. [R. 81–82]. When he was unable to reach his counsel, appellant made no request to postpone the search until he could talk to his counsel. The decision of the

appellant to give his consent does not appear to have been coerced in any way by the NIS agents, and we perceive nothing to indicate that the NIS agents attempted to prevent appellant from talking to his counsel.

As to appellant's contention that the rationale of *McOmber* extends to a request for consent to conduct a search, we reiterate our view that *McOmber* is directed toward questioning and the preservation of the right against self-incrimination. The issue to be addressed, therefore, is whether a request for consent to search can be equated to questioning designed to elicit a statement.

The right to be free from unreasonable search has consistently been treated differently than the right against self-incrimination. In *United States v. Insani*, 10 U.S.C.M.A. 519, 520–521, 28 C.M.R. 85, 86–87 (1959), the Court of Military Appeals stated:

This right [against self-incrimination] is entirely different from the right to be free from unreasonable search. It is reciting the obvious to say there can be an interrogation without a search, and conversely, a search without interrogation. Where there is either interrogation or a search, the admissibility of evidence obtained therefrom is ordinarily tested by the principles applicable, to the one or the other, as the case may be, but not to both.

\* \* \* \* \* \*

Consent to a search is by itself in no way incriminating. It relates only to the preliminary question of the lawfulness of the search. In that regard it is no different from any other basis for a legal search. We see no sound reason to set it apart from the other bases for a search by requiring that the accused be first warned of his separate and different rights under Article 31.

The Court of Military Appeals again confronted this issue after the decisions in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *United States v. Tempia, supra,* which dealt with the right to counsel at the time of custodial interrogation. In *United States v. Rushing,* 17 U.S.C.M.A. 298, 38 C.M.R. 96 (1967), it was held that a suspect, even though being subjected to custodial interrogation, had no right to counsel when asked for his consent to a search. It was recognized that the right to counsel exists in every "critical confrontation between the individual and the Government." [*Id.* at 301, 38 C.M.R. at 99). However, it was held that there was "nothing in a consent situation to make it so critical a stage of the proceedings against the accused as to require that the right to counsel be extended to it and the ensuing search." [*Id.* at 302, 38 C.M.R. at 100]. It was also held that "Consent to a search, like consent to the taking of a sample of blood or fingerprints, is not subject to manipulative conditions which endanger or derogate from the accused's right to a fair trial . . . the absence of counsel at the time of a request for consent to a search is not essential to the preservation of the right of the individual, under the Fourth Amendment, to be secure from unreasonable search." [*Id.* at 303, 38 C.M.R. at 101].

The Court has also addressed quite recently whether statements made in connection with the granting of consent to search are protected by the right against self-incrimination. In *United States v. Morris,* 1 M.J. 352 (1976), the accused acknowledged ownership of an automobile just before consenting to have it searched. He contended this acknowledgement was an unwarned incriminating statement. Chief Judge Fletcher indicated:

. . . in deciding *Rushing* and *Insani,* the Court necessarily concluded that such an acknowledgement would not constitute a statement in response to an "interrogation" and hence fell outside the scope of *Miranda* and Article 31. The same rationale controls here. [*Id.* 1 M.J. at 354].

■ In view of the foregoing, we conclude that the request by the NIS agents for appellant's consent to search was not a "questioning" and appellant's consent was

not a "statement", as contemplated by Article 31 and *Miranda v. Arizona, supra.* For this reason, we further conclude that the request for consent to search was not in violation of the proscription on "questioning" of an accused after the appointment or retention of counsel, intended by *United States v. McOmber, supra.*

### IV

Appellant argues that his sentence is inappropriately severe. He specifically mentions the dishonorable discharge and the two years confinement approved by the convening authority. After review of all the circumstances surrounding this appellant and his offenses, we concur with appellant's contention concerning the length of confinement but not with respect to the type of discharge.

There can be no gainsaying that these are serious offenses. The financial loss to the United States, $450,820, is staggering; the threat to national security posed by the loss of these integral components of a highly classified weapons system is frightening. The appellant took advantage of his position as a security watch to carry out his crime, indicating that he intended to remove the electronic parts for his own uses. Instead, he merely discarded the electronic parts in a dumpster near his apartment and the boxes in the lake in Virginia Beach when they no longer were of any interest to him.

On the other hand, the record of trial reveals the appellant to have been a 19-year old airman with an excellent and clear record over his one year of naval service at the time of these offenses. He obviously had a fine family background and also enjoyed an excellent reputation in his former civilian community. In addition, appellant had recently married a girl from his hometown whom he had known for three years.

■ The severity of a dishonorable discharge is well-recognized, and such a discharge should be reserved for those who deserve to be separated under conditions of dishonor, after commission of the most serious crimes. Paragraph 76a, MCM, 1969

(Rev.). Appellant is a trained aviation electronics technician, and he indicated a familiarity with AWG–9 equipment. We find it only reasonable to infer that he was aware of the value and significance of the property he was taking. Appellant's crime is one which could have had a direct effect on national security. In our view, it is the type of conduct which warrants a discharge of the severest nature.

■ The record of trial also contains a Petition for Clemency submitted in appellant's behalf by his military defense counsel following trial. Included with this petition is additional evidence as to the prior good character and reputation of appellant, as well as a letter from appellant's former squadron commander detailing appellant's complete cooperation during post-trial interviews to help close out the investigation of this matter. Appellant has cited this evidence in support of his request that the previously approved dishonorable discharge be reduced to a bad conduct discharge. We view these post-trial matters, and the request concerning the discharge, as directed toward clemency for the appellant and more appropriate for consideration by the Naval Clemency and Parole Board.

■ Although we do not agree with appellant in his contentions as to the approved dishonorable discharge, we view the approved two years confinement in a different light. Realization of the disgrace brought on himself and his family by his conviction by general court-martial should have already served as a substantial punishment. The further rehabilitative and deterrent aspects of punishment for this appellant would appear to be adequately served by a lesser period of confinement.

Accordingly, the findings of guilty and only so much of the sentence approved on review below as provides for a dishonorable discharge, confinement at hard labor for one year, forfeiture of $200 per month for one year, and reduction to pay grade E–1 are affirmed.

Chief Judge CEDARBURG and Judge ROOT concur.