UNITED STATES

v.

James G. SUMMERS, 492 64 0134, Sergeant (E-5), U. S. Marine Corps.

NCM 79 1505.

U. S. Navy Court of Military Review.

Sentence Adjudged 7 March 1979.

Decided 17 April 1981.

LCDR Kerry T. Davidson, JAGC, USN, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Defense Counsel.

LTCOL A. P. Tokarz, USMC, Appellate Government Counsel.

CAPT Craig L. Kemmerer, USMCR, Appellate Government Counsel.

Before CEDARBURG, C. J., and SANDERS and DONOVAN, JJ.

DONOVAN, Judge:

Contrary to his pleas, appellant was convicted by a general court-martial composed of officer and enlisted members of wrongful possession of an unregistered firearm, consensual sodomy with a female and carrying a concealed firearm, all offenses occurring the same day aboard a military base. Articles 92, 125, 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C.A. §§ 892, 925, 934. The sodomy offense was a lesser included finding than the forcible sodomy charged and prosecuted at trial. Appellant was sentenced to 60 days restriction, forfeiture of $369.00 pay per month for 1 month and a reduction to pay grade E–3.[1] The convening authority considered a clemency request, appellant's responsibility for his wife and two children and his good record, but approved the findings and sentence without change.

On Tuesday morning, 24 October 1978, appellant received information, while on duty, that one of his children was injured while in the care of a babysitter. He received permission to depart his unit for the purpose of taking the child to medical treatment. According to his testimony, since the Navy medical office appointed a time some hours later, appellant used the interval to conduct bank business in town. After obtaining cash, he saw Miss W crossing a street, thought she was a prostitute, and

called her over to his car. Following conversation, she entered his car and they proceeded onboard Camp Pendleton where sexual activity occurred in his car in a secluded area. Her immediate complaint to authorities recited a version of events in the car somewhat different than his. Both agreed some money would be paid her, but they differ on the expected activity, as well as on the effect on her will of appellant's visible revolver and how it was handled. They agreed she was naked upon exiting his car, but differ on how and where her clothing was deposited.

Appellant assigns six errors. The last four are without merit. We will discuss the first two and, finding merit, reverse the findings and sentence.

I

THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING THE DEFENSE MOTION TO SUPPRESS THE CONFESSION OF THE APPELLANT AND THE OTHER EVIDENCE DERIVED THEREFROM.

II

THE JUDICIAL CONFESSION OF THE APPELLANT WAS THE FRUIT OF THE PRIOR UNLAWFULLY OBTAINED EVIDENCE.

Appellant testified in support of his motion to suppress his written statement to NIS agents and evidence derived therefrom, including his purported consent to search his car. His rendition of the sequence in which he was questioned and waived his rights raises substantial doubt as to the legality of NIS conduct.[2]

[1.] We review this case pursuant to Article 69, UCMJ, 10 U.S.C.A. § 869, and the Judge Advocate General's direction to consider six issues. By an "addendum" to the Staff Judge Advocate's Review of this case, the command notes that appellant was "separated from the Marine Corps with an honorable discharge on 3 July 1980". This Court administratively confirmed that advice and learned that his discharged pay grade was E–3, reflecting the reduction adjudged.

[2.] Appellant's credibility suffered when he retook the stand to testify on the merits. Therein he freely acknowledged carrying concealed on his waist or in his car's glove compartment a .357 caliber revolver, asserting, however, that he never carried it loaded with ammunition. He said carrying it was a "habit"; he had no California state license to carry it. He denied threatening Miss W with it in town or at the secluded spot, admits it was on his knee in the car but insists it was pointing at the dashboard, not at her, when he ordered her out of the car.

Appellant was ordered, about 1315 on 8 November 1978, to report to NIS headquarters onboard Camp Pendleton. Switching his car for that of a friend, he drove there, arriving approximately 1400. Upon entry, an agent noted his physical resemblance to the described offender as well as a gold tooth previously described by the victim. After some questions, the agents photographed him and sent for the victim; appellant was left waiting in an empty room. Agent M testified that "It [the photograph] was approximately ... 15 to 20 minutes after he arrived and we had talked with him for that period of time, and then we interviewed him." (R.94). No trial participant clearly enumerated the topics discussed, questions asked or answers given during this period; appellant's whereabouts on 24 October 1978, his car and its purchase seem, from the subsequent transcript, clearly to have been discussed. Unknown to appellant, the victim arrived and identified him as the offender from a photo array. Appellant signed two NIS forms: Prosecution Exhibit 1 is a consent to search his car and his quarters; Prosecution Exhibit 2, signed later that day, is a suspect's acknowledgement and waiver of rights (hereinafter "warnings form"). Having obtained his consent, Prosecution Exhibit 1, the NIS agents left with him to search his quarters for clothing, visually examining his automobile enroute. The warnings form still had not yet been administered nor the rights thereon explained to appellant. The quarters search extended from 1630 to 1659.

NIS agents contradicted appellant's testimony as to the interrogation sequence by swearing that the nature of the offenses of which appellant was suspected was indeed written on the warnings form before before he signed it and that the form was not, as he testified, blank. We accept that as a fact, Article 66(c), UCMJ, 10 U.S.C.A. § 866(c), noting, however, that neither the date of the offense nor the complainant's name were entered on the form in the blank spaces where NIS advises the offense of which a person is suspected. Our reversal turns, however, on NIS delaying tactics. The rights of a suspect, Article 31(b), 10 U.S.C.A. § 831(b). UCMJ, were not explained to appellant until 1741 in the late afternoon.[3] He had been in NIS custody several hours, some of which was spent in an "interview" room which had bars on the window and a closed door; he was, at all other times, accompanied by an agent. NIS calculatingly let appellant wait for over an hour in the "interview" room while Miss W was brought down to NIS headquarters and picked his fresh photo from a photo-array and identified his car (which NIS summoned be brought down by appellant's friend—a temporary driver). Only after amassing this evidence did NIS shift semantic signals and reclassify appellant from a "possible suspect" to a suspect who rated warnings.

Government agents may qualify the noun "suspect" with such adjectives as "possible"[4], "potential"[5] and "prime"[6] if such

In a futile attempt to rebut her damaging testimony of how he left her naked and drove away flinging her clothes out the car, he testified that he drove off leaving her naked, but carefully dropped her clothes some distance away. He told the members his motive for this but the words add to nothing intelligible. He admits refusing to pay her the sum of money previously agreed for the sexual activity. Although the victim's initial entry into his car may have been a hybrid of her version and his, his testimony on subsequent events is, in my view, heavily perjured and inherently incredible.

3. Agent M testified no inducements were made to secure appellant's consent in writing to search his car and his quarters. (R.234). There was no objection by defense that the

question "What inducements, if any, were given to him?" is a mixed question of *law and* fact and in part calls for a legal conclusion. Better practice in such issues would be to pose the classic journalistic questions of who—what—when—where—how and why of the interrogation and search sequences, leaving to the judge and fact-finders the decision whether certain acts or omissions were legally "inducements" affecting voluntariness.

4. (R.92, 98, 108.)

5. (R.116.)

6. (R.99.)

modifiers aid internal administration but for purposes of the warnings required by Article 31(b), UCMJ [7], the law allows no modifiers. A suspect is entitled to those warnings and they may not be delayed, as here, while NIS agents accumulate evidence of guilt.

Who becomes a suspect, and when, is a difficult question. It can be a gradual process or sudden. The determination is objective, not subjective. *United States v. Rice*, 3 M.J. 1094 (N.C.M.R.1977), and cases cited therein. Government agents are not unduly burdened with a duty to warn every person from whom they seek a few answers, in order to narrow their focus from a large group to a few. The factual events in *United States v. Rice, supra*, are exemplary of a properly paced sequence of questions, suspicion, warnings and interrogation. When substantial incriminating facts have emerged, and the person is still not warned but held incommunicado for 1½ hours in a barred "interview room", (R.102), and finally warned only when the evidence has been accumulated and evaluated, government agents have impermissibly waited too long since they acquired answers from an unwarned suspect to build their case in violation of the cited statute. Reliance on the interrogator's subjective standard of when a person is a suspect is impermissible; again, the standard is objective. *United States v. Rice, supra* at 1100. *See United States v. Tibbetts*, 1 M.J. 1024 (N.C.M.R. 1976).

Government testimony was inconsistent as to how they handled prior "possible suspects". Several "possible suspects" were eliminated if a telephone call to the unit confirmed the Marine was on duty with his unit on the morning of 24 October 1978. When NIS learned that appellant was excused on the date of the offense for his child's injury, he was more than a "possible suspect". When his face and gold tooth were seen on his reporting to NIS headquarters, a narrower spotlight shone on him.[8] We reverse for failure to advise a suspect in violation of Article 31(b), UCMJ. *See United States v. Leiffer*, 10 M.J. 639 (N.C.M.R.1980). We do not reach the related issue whether the questioning was custodial and conducted in violation of *Miranda/Tempia* rights to counsel.[9]

Appellant's judicial confession, during direct and cross-examination, flowed directly from the judge's denial of the motion to suppress. *United States v. Nargi*, 2 M.J. 96 (C.M.A.1977). Accordingly, the findings and sentence, which rely on evidence derived from the illegally obtained confession, are set aside. Forfeitures and reduction in grade must be restored.

Chief Judge CEDARBURG and Judge SANDERS concur.

---

7. Article 31(b), UCMJ, provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

8. The staff judge advocate advised, (SJAR at 4), that the warnings form should have been accomplished right then. We concur, although that view is not binding in the appellate process. *United States v. Kinion*, 5 M.J. 930 (N.C.M.R.1978).

9. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). *See also* Rule 305(d), Military Rules of Evidence.