*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

_____

Before
HOLIFIELD, GROSS, and BLOSSER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Christopher F. PATTERSON**
First Lieutenant (O-2), U.S. Marine Corps
*Appellant*

**No. 202200262**

_____

Decided: 4 April 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Derek A. Poteet (motions)
Andrea C. Goode (arraignment, trial)

Sentence in the Entry of Judgment: confinement for thirty-six months and a dismissal.

For Appellant:
*Captain Arthur L. Gaston III, JAGC, USN*

For Appellee:
*Lieutenant Commander Paul L. LaPlante, JAGC, USN* (argued)
*Major Mary Claire Finnen, USMC* (on brief)

Judge BLOSSER delivered the opinion of the Court, in which Chief Judge HOLIFIELD and Judge GROSS joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

BLOSSER, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of 17 specifications of indecent recording, in violation of Article 120c, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts five assignments of error [AOEs], which we rephrase and renumber as follows: (1) whether the military judge erroneously denied Appellant's motion to suppress his statements to agents of the Naval Criminal Investigative Service [NCIS]; (2) whether the military judge plainly erred by granting the Government's motion to admit evidence under Military Rule of Evidence [Mil. R. Evid.] 404(b); (3) whether trial defense counsel were ineffective for not moving to suppress evidence derived from a warrantless search of a Secure Digital [SD] memory card found inside a recording device placed surreptitiously in the men's locker room; (4) whether trial defense counsel were ineffective for not moving to suppress evidence derived from searches of Appellant's mobile phone and laptop; and (5) whether trial defense counsel were ineffective for not opposing the Government's use of evidence under Mil. R. Evid. 404(b). We find merit in Appellant's first AOE. Given the relief provided in our decretal paragraph, we need not address the remaining AOEs.

## I. BACKGROUND

On the morning of 17 December 2022, a Marine noticed a pen on the floor under a radiator in the male locker room of the Expeditionary Operations Training Group [EOTG] building aboard Marine Corps Base, Camp Pendleton.[2] Upon initial inspection, the Marine realized the item was not an ordinary pen because it had lights on it, what appeared to be a microphone, and an

---

[1] 10 U.S.C. § 920c.

[2] R. at 460–61.

SD card inside.[3] The Marine took the suspected recording device from the locker room and gave it to his superior officer.[4]

An agent from NCIS took possession of the device later that day.[5] At the time, there was a national security and counterintelligence concern with the device because intelligence personnel and other Marines with access to classified information frequented the locker room where it was found.[6] The agent, with the assistance of an NCIS Digital Forensic Examiner, conducted a review of the SD card's contents. The review revealed a video of Appellant manipulating the device, looking directly at the camera, and placing it under the radiator where it was found.[7]

The content review also revealed numerous videos of what appeared to be Appellant engaged in consensual sexual intercourse with unknown men.[8] There were deleted folders with names such as "Marine1," "Big Asia," "Big Asian Dude," and "Mexican Dude."[9] Within the deleted folders, there were two videos of a male later identified as Captain Jones[10] and one video of a male later identified as Captain Clark completely naked in their respective bedrooms.[11]

Appellant's Regimental Executive Officer [XO]—Lieutenant Colonel [LtCol] Hill—received a call from NCIS requesting assistance in arranging an interview with Appellant regarding "something that happened over at [I Marine Expeditionary Force]."[12] LtCol Hill called Appellant and left a voicemail

---

[3] R. at 461, 467–68.

[4] R. at 470.

[5] R. at 92-93.

[6] R. at 93.

[7] R. at 239–40.

[8] App. Ex. XXXVI at 20.

[9] Pros. Ex. 50 at 1–2.

[10] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[11] Pros. Ex. 50 at 2.

[12] R. at 130; R. at 122–24.

at 1837[13] on Saturday, 17 December 2022. Appellant returned the call immediately and LtCol Hill directed him to report to the XO's office.[14] Appellant put his uniform on and traveled to the regimental headquarters, arriving around 1900.[15] LtCol Hill took Appellant into his office and closed the door. Both Marines sat down once in the office.[16] LtCol Hill told Appellant that NCIS wanted to talk to him and that another officer assigned to the unit, Captain Thomas, would escort him to the NCIS office.[17] LtCol Hill told Appellant, "[D]on't squirrel around, just answer their questions."[18] LtCol Hill spoke in a conversational tone[19] and the meeting lasted five to six minutes.[20]

Immediately following his meeting with LtCol Hill, Appellant, escorted by Captain Thomas, traveled from the regimental headquarters to the NCIS field office in a Government vehicle.[21] Two NCIS agents took Appellant to an interview room at 1925 where they engaged in "small talk" with him and asked him for biographical information during the first 13 minutes.[22] At 1938, the lead agent began advising Appellant of his rights under Article 31(b), UCMJ,[23] and *United States v. Tempia.*[24]

---

[13] The times indicated by Appellant during a motion to suppress his statements to NCIS were based off his phone record. R. at 30; App. Ex. XXIII at 1. However, we note Appellant signed his rights advisement form at 1942, which conflicts with his declaration and testimony that LtCol Hill left a voicemail at 2037. Pros. Ex. 4; App. Ex. XXXVI at 14; App. Ex. XXV at 28. Appellant's phone record indicates his mobile number has a 318 area code. App. Ex. XXIII at 1. We take judicial notice that the 318 area code is in Louisiana, and that the Central Time Zone is two hours behind the Pacific Time Zone where Marine Corps Base Camp Pendleton is located.

[14] App. Ex. XXII at 1; R. at 125.

[15] R. at 30–31.

[16] R. at 129.

[17] R. at 31.

[18] *Compare* R. at 136, 142, *and* App. Ex. XXII at 2, *with* R. at 138 (LtCol Hill responding in the negative to trial counsel's question whether, at any time, he told Appellant to answer NCIS' questions).

[19] R. at 137.

[20] App. Ex. XXII at 2.

[21] *Id.*

[22] Pros. Ex. 4.

[23] 10 U.S.C. § 831(b).

[24] *United States v. Tempia*, 37 C.M.R. 249 (C.M.A. 1967).

The lead agent began the rights advisement by saying, "Before we can talk to you, we just have to go over this form with you, okay?"[25] He described it as "[n]ot a scary form" and "just a piece of paper."[26]

After informing Appellant that he was suspected of indecent viewing, visual recording, and broadcasting, the lead agent asked him if he knew "the difference between being suspected of doing something and being accused of something."[27] Appellant responded with "if you're suspected then you're suspected."[28] The lead agent then explained,

> [S]uspected of something means like "hey we need to talk to this person because they might have some kind of knowledge about it." Being in the military, if I think you have anything to do with this, I have to advise you of your rights. Okay. That's why I'm advising you of your rights. Uh. Because I want to know something you may have knowledge of.
>
> . . .
>
> Accused of something is when you're actually sitting in front of the judge and the judge is saying that you did this okay. So, if me and you are at the bar, you know, having some drinks and [John] falls down and starts bleeding and he points in our general direction and he says, "That guy stabbed me." Right? The police are going to want to talk to us because we might know something about [John] being stabbed without saying that we stabbed him. It's saying that we might have some kind of knowledge of what happened.
>
> . . .
>
> I don't want you to think that we are accusing you of anything. We're just here to find out some information.[29]

Appellant ultimately signed the rights advisement, initialing each paragraph, and reading the last paragraph aloud:

---

[25] Pros. Ex. 4; App. Ex. XXXVI at 11.

[26] *Id.*

[27] Pros. Ex. 4; App. Ex. XXXVI at 12.

[28] *Id.*

[29] Pros. Ex. 4; App. Ex. XXXVI at 12–13.

> I understand my rights as related to me and said rights as set
> forth with the understanding that I do not desire to remain si-
> lent, consult with or retain or appoint a lawyer, or have a lawyer
> present at this time. I make this decision freely and voluntarily.
> No threats or promises have been made to me.[30]

Initially, Appellant provided a false story, denying ownership of the hidden recording device and any related criminal conduct. He explained that he found the device in the locker room and initially thought it was a pen, but realized it was some sort of recording device after he picked it up and looked at it.[31] Appellant drew a diagram of the locker room and where he found the recording device, and explained how he thought about turning it in to appropriate authorities but ultimately decided not to. The agents allowed Appellant to spin this yarn for around nine minutes before confronting him with their knowledge of the multiple recordings of him on the SD card.

While initially confronting Appellant with evidence of his criminality, the lead agent stated, "I don't want you to walk out of here and me have to you know tell your boss that um you know [Appellant] lied to us today."[32] When Appellant asked the agent if he should get a lawyer, the agent responded

> I can't make that decision for you, um but at this point if you ask
> for a lawyer, I couldn't talk to you anymore. Um. And you made
> a statement, right, and that's what I'll have to report, um, but I
> can't make that decision for you . . . I would love to hear your
> story, I would love that, but I can't decide if you if you (sic) want
> a lawyer. That that's (sic) up to you. Like I said, I would like to
> hear your story, but I can't make that decision for you.[33]

Hearing this, Appellant agreed to keep talking.

Throughout the interview, the NCIS agents referred to their need to report to Appellant's command on no less than 11 occasions.[34] At one point, the lead agent held a blank piece of paper and said,

---

[30] Pros. Ex. 4; App. Ex. XXXVI at 13; App. Ex. XXV at 28.

[31] Pros. Ex. 4; App. Ex. XXXVI at 14–15.

[32] Pros. Ex. 4; App. Ex. XXXVI at 20.

[33] Pros. Ex. 4; App. Ex. XXXVI at 20–21.

[34] Pros. Ex. 4.; App. Ex. XXXVI at 20, 22 ("We find out what happened, and we report that to your command."), 23 ("[W]e receive any kind of incident such as this, we find out all the facts behind it, we report it to your commanding officer . . . They make

> So, imagine that this piece of paper had, you know, was full of writing, had a story, right, and that story would be your story and you give that story directly to Colonel [Brooks—the Regimental Commanding Officer—]and you say this is what happened. This is everything that happened, right. Would that be easy to read?
>
> . . .
>
> And it would be easy for him to understand and make an informed decision.[35]

The agent began crumpling and tearing the paper while saying,

> Well every piece that we're missing is just crumpled the paper, tears in the paper, and you know, like rip it to pieces and then I have to take it to Colonel [Brooks] and say, "here's what happened." Right. Is that easy to read?[36]

The agent pushed the paper toward Appellant and said,

> So, what if you could iron that out for me right now? I got all the pieces back and I could just tape it up.
>
> . . .
>
> And I took it to Colonel [Brooks] and Colonel [Reed] and I could say, "Here's the story. It might be a little crinkled, but, you

---

kinda the decision on where this goes, right, right based on the facts that we can find, right."), 34 ("We're just the fact finders . . . [What happens next] is gonna be up to your command."), 35 ("[This investigation] is strictly between you, me and [John], our bosses obviously, and we communicate directly with O-6 level command."), 42 ("[If there's nothing on your computer,] then we give it right back and set Colonel [Brooks] and Colonel [Reed] . . . mind at ease."), 46 ("These are all things Colonel [Reed] and Colonel [Brooks] are gonna want answered and they look to us, me and [John] to answer these questions."), 47 ("[W]hat you can control is what you do right now. The things you say in here. Because what you say in here is gonna go from here to the ears of the people that matter."), 62 ("[T]his is between you, [John], and I and, you know, your senior command, senior level command."), 63 ("Um and remember man, just, like the statement to Colonel [Brooks], the best way we can give it to him, we will. Um, but we can't do that without your help."), 67 ("Colonel [Brooks] is gonna know about this or Colonel [Reed] and I'm not sure which way it's gonna go, but they're um gonna find out about this like as soon as I'm done talking to, I'm calling them to tell them whatever your future is going to be.").

[35] Pros. Ex. 4; App. Ex. XXXVI at 49.

[36] *Id.*

know, me, Chris, and [John], we sat down and we ironed every-
thing out. This is what happened."[37]

At 2316, Appellant requested to look at the rights advisement form again.
After re-reading the form, he invoked his right to consult an attorney prior to
additional questioning and the NCIS agents honored that invocation.[38] How-
ever, by that point in the interrogation, Appellant had already characterized
himself as a "hit-it-and-quit-it kind of person,"[39] admitted to placing the re-
cording device in the EOTG male locker room for his sexual gratification, and
admitted to recording his sexual encounters with men he met on Grindr[40] on
at least 10 to 12 occasions without their knowledge or consent.[41] He also iden-
tified Captains Jones and Clark by name and admitted to recording each of
them naked in their bedrooms without their knowledge or consent. Although
all of these recordings were captured on the SD card in NCIS's possession, Ap-
pellant admitted to previously inserting the SD card into his laptop computer
for viewing.[42] He also informed the NCIS agents that his mobile phone was
located in his truck in his regiment's parking lot, and that his laptop was lo-
cated in his off-base residence.

The next day (18 December 2022), upon the lead NCIS agent's request,
Colonel Brooks authorized a search of Appellant's truck to seize his mobile
phone.[43] The agent used many of Appellant's admissions during his interroga-
tion in the supporting affidavit.[44] Similarly, a Federal Magistrate Judge signed
a warrant authorizing a search of Appellant's off-base residence to seize any
audio/video recording devices, media storage devices, Appellant's laptop, and
paraphernalia associated with video voyeurism.[45] The agent included many of
Appellant's admissions during his interrogation in the supporting affidavit.[46]

---

[37] Pros. Ex. 4; App. Ex. XXXVI at 49–50.

[38] Pros. Ex. 4; App. Ex. XXXVI at 94-95.

[39] Pros. Ex. 4; App. Ex. XXXVI at 37, 55, 65.

[40] Grindr is a "social networking app for gay, bi, trans, and queer people."
https://www.grindr.com/about, *last visited* 18 March 2024.

[41] Pros. Ex. 4; App. Ex. XXXVI at 27.

[42] Pros. Ex. 4; App. Ex. XXXVI at 30.

[43] App. Ex. L.

[44] App. Ex. L at 4–5.

[45] Govt. Mot. to Attach, Appendix A.

[46] Govt. Mot. to Attach, Appendix A at 3–5.

NCIS agents searched Appellant's truck and residence on 18 December 2022, seizing his mobile phone and laptop, among other items. The agents ultimately searched the data on Appellant's mobile phone and laptop, and found additional incriminating evidence.

Appellant moved to suppress his statements to the NCIS agents and all evidence derived therefrom as violative of the Fifth Amendment, Article 31, UCMJ, and Mil. R. Evid. 305.[47] The Government opposed the suppression motion, but conceded Appellant's interrogation was custodial.[48] The military judge denied the motion orally on the record with no follow-on written supplement.[49]

In his ruling, the military judge found that: (1) Appellant is a very intelligent man who performed well on standardized tests, holds a degree in microbiology, and completed the requirements to become a communications officer in the Marine Corps; (2) Appellant was 30 years old during his NCIS interrogation; (3) Appellant served in a variety of billets carrying responsibility; (4) Appellant demonstrated he understood his rights while reading the rights advisement form; (5) LtCol Hill appeared credible, truthful, and forthright; (6) Appellant was less credible when he testified he did not think lying to NCIS was "squirrely"; (7) LtCol Hill likely gave Appellant some sort of admonishment to answer questions; (8) LtCol Hill did not intend to prevent Appellant from invoking his rights; (9) LtCol Hill's admonishment was "benign" in terms of his intentions; (10) LtCol Hill's conversation with Appellant was "significantly attenuated" from the beginning of Appellant's NCIS interrogation; (11) the NCIS agents did nothing improper with respect to the conduct of the interview; and (12) the interrogation occurred late at night and lasted four hours.[50] The military judge assessed these facts, considered the totality of the circumstances, and concluded Appellant knowingly and intelligently waived his rights. The military judge did not address whether Appellant's rights advisement complied with the requirements of Article 31(b) or *Tempia*.[51]

Additional facts necessary to resolve Appellant's first AOE are discussed below.

---

[47] App. Ex. XXI; R. at 23–77, 120–58.

[48] App. Ex. XXIV at 8.

[49] R. at 158–62.

[50] *Id.*

[51] *Tempia*, 37 C.M.R. 249.

## II. Discussion

### A. Standard of Review

We "review a military judge's denial of a motion to suppress for an abuse of discretion."[52] This is a strict standard, "calling for more than a mere difference of opinion."[53] A military judge abuses his discretion when he: (1) "predicates a ruling on findings of fact that are not supported by the evidence of record," (2) "uses incorrect legal principles," (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts."[54] We review conclusions of law de novo.[55]

### B. Ineffective Rights Advisement

#### 1. Law

"No person subject to [the UCMJ] may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected . . . ."[56] "Congress enacted Article 31(d), UCMJ, as a strict enforcement mechanism to implement the rights' warning requirements of Article 31(b), UCMJ."[57] Article 31(d) provides that "[n]o statement obtained from any person in violation of [Article 31] . . . may be received in evidence against him in a trial by court-martial."[58] Military Rule of Evidence 305(c)(1) similarly provides that "[a] statement obtained from the accused in violation of the accused's rights under Article 31 is involuntary and therefore inadmissible against the accused."[59]

---

[52] *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (citation omitted).

[53] *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted).

[54] *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022).

[55] *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000).

[56] Article 31(b), UCMJ, 10 U.S.C. § 831(b).

[57] *United States v. Gardinier*, 65 M.J. 60, 63 (C.A.A.F. 2007) (internal quotations and citation omitted).

[58] Article 31(d), UCMJ, 10 U.S.C. § 831(d).

[59] Mil. R. Evid. 305(c)(1).

Article 31(b)'s requirement to inform a suspect of the nature of the accusation has been the subject of many appellate cases.[60] While an investigator need not use the "precision and expertise of an attorney in informing an accused of the nature of the accusation,"[61] he may not mislead the person by informing him he is not accused of criminal conduct when the opposite is true.[62]

*2. Discussion*

We find the military judge abused his discretion by failing to consider important facts. In its response to Appellant's motion, the Government provided the military judge a copy of Appellant's NCIS interrogation video.[63] On that video, at the beginning of Appellant's rights advisement, the lead NCIS agent makes a distinction between suspicion and accusation that is unsupported by the law.[64] The agent then drew upon this distinction to say, "I don't want you to think that we are accusing you of anything."[65] The military judge failed to consider these important facts in his ruling.

A proper rights advisement under Article 31(b) and *Tempia* is more than a formality—it is not "just a piece of paper" or a mere "form" as the lead agent

---

[60] *See, e.g., United States v. Simpson*, 54 M.J. 281, 284 (C.A.A.F. 2007) ("[T]he accused or suspect must be informed of the general nature of the allegation, to include the area of suspicion that focuses the person toward the circumstances surrounding the event.") (citations omitted); *United States v. Ruiz*, 54 M.J. 138, 139 (C.A.A.F. 2000) ("A person subject to the Uniform Code of Military Justice may not 'interrogate' a suspect without first informing the suspect of the nature of the accusation, the right to remain silent, and that any statement made may later be used as evidence in a court-martial.") (citing Art. 31(b), UCMJ, 10 U.S.C. § 831(b)); *United States v. Rogers*, 47 M.J. 135, 137 (C.A.A.F. 1997) ("The purpose of informing a suspect or accused of the nature of the accusation is to orient him to the transaction or incident in which he is allegedly involved.").

[61] *Simpson*, 54 M.J. at 284 (citation omitted).

[62] *See United States v. Erie*, 29 M.J. 1008, 1012 (A.C.M.R. 1990) ("use of [trickery, artifice, and subterfuge] in obtaining a waiver of rights or in dissuading invocation of rights is not permissible") (citations omitted).

[63] App. Ex. XXIV at 14; App Ex. IX at 29.

[64] In its answer and during oral argument, the Government attempted—without citation to authority—to defend the agent's distinction between "accused" and "suspected." Govt. Ans. at 30. We are unconvinced.

[65] Pros. Ex. 4; App. Ex. XXXVI at 12–13.

described it.[66] And, more importantly, the plain language of Article 31(b) requires informing an accused or suspect of the "accusation" irrespective of whether "he is accused or suspected."[67] The agent's departure from the statute's mandates—especially his explicit statement that he was *not accusing Appellant of anything*—rendered the rights advisement inadequate and Appellant's subsequent statements inadmissible in accordance with Article 31(d).[68]

### 3. Prejudice

If a statutory violation of Appellant's Article 31(b) rights does not also include a constitutional violation,[69] then the test for prejudice spelled out in *United States v. Kerr*[70] applies.[71] This requires weighing "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[72]

Here, the Appellant's confession was quite probative and perhaps the most damaging evidence admitted against him.[73] Without the improperly admitted evidence, the Government's case would have been considerably weakened. In the video of Appellant's NCIS interrogation, he admitted to at least two of the three elements of an Article 120c, UCMJ, violation. He unequivocally admitted to knowingly making the recordings and, in most cases, doing so without the other person's consent—a fact apparently not discernable from the recordings alone. In its opening statement, the Government relied on this video as one of

---

[66] *Tempia*, 37 C.M.R. 249; *United States v. Campbell*, 76 M.J. 644, 654 (A.F. Ct. Crim. App. 2017); Pros. Ex. 4; App. Ex. XXXVI at 11.

[67] Article 31(b), UCMJ, 10 U.S.C. § 831(b).

[68] *Id.*

[69] We address the constitutional violation separately *infra*.

[70] *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

[71] *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016).

[72] *Kerr*, 51 M.J. at 405 (citations omitted).

[73] *See United States v. Ellis*, 57 M.J. 375, 381 (C.A.A.F. 2002); *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the [factfinder]. . .") (internal quotation and citations omitted).

"three main categories of evidence" it would rely on to prove its case.[74] Appellant's statements took on a prominent role in the lead agent's testimony. Then, after admitting the video of Appellant's interrogation, the Government argued it showed Appellant's motive and intent.[75]

Accordingly, we find that admission of Appellant's interrogation was not harmless and that it materially prejudiced his substantial rights.

## C. Voluntariness of Appellant's Statements

### 1. Law

In addition to Article 31's statutory safeguards, "the Due Process Clauses of the Fifth and Fourteenth Amendments protect an accused generally against the admission of any involuntary statements."[76] When analyzing the voluntariness of an appellant's statements to law enforcement, we review the totality of the circumstances to determine whether the person's "will was overborne and his capacity for self-determination was critically impaired."[77] Courts look to the characteristics of the accused, including his health, age, education, experience, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.[78] Courts also consider whether the statement was made due to "deliberately coercive or improper tactics."[79]

### 2. Discussion

Even if we assume the rights advisement did not violate Article 31, we would still find, under the totality of the circumstances, that Appellant's due process rights were violated and that his statements to NCIS were not voluntary.

---

[74] R. at 181-183.

[75] R. at 783.

[76] *United States v. Chatfield*, 67 M.J. 432, 439 (C.A.A.F. 2009) (citing *Dickerson v. United States*, 530 U.S. 428, 433–34 (2000).

[77] *Chatfield*, 67 M.J. at 439 (quoting *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996)).

[78] *Ellis*, 57 M.J. at 379; *Chatfield*, 67 M.J. at 439; *see also Bubonics*, 45 M.J. at 95; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

[79] *United States v. Young*, 49 M.J. 265, 267 (C.A.A.F. 1998) (quoting *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)).

We find the military judge, in ruling otherwise, abused his discretion in three ways.

First, the military judge abused his discretion by failing to consider important facts. Specifically, while the military judge found it was "likely that there was some sort of admonishment by [LtCol Hill] to answer questions,"[80] he failed to consider the compound effect of that directive in relation to the agents' repeated reference to their need to report to Appellant's command. Similarly, as discussed *supra*, the military judge failed to consider the improper character of Appellant's rights warning.

Second, by focusing on LtCol Hill's intent rather than Appellant's perception, the military judge abused his discretion by using incorrect legal principles. The correct legal lens is from the perspective of the person making the statement.[81]

Third, by finding LtCol Hill's conversation with Appellant "significantly attenuated" and doing so without discussion of what legal principle led to that conclusion, the military judge abused his discretion either by applying an incorrect legal principle or by applying the correct legal principle in a clearly unreasonable way. Appellant entered LtCol Hill's office as ordered around 1900.[82] This meeting lasted five to six minutes, after which, a superior officer, Captain Thomas, escorted Appellant to NCIS.[83] The lead NCIS agent began discussing Appellant's rights at 1938, after 13 minutes of "small talk."[84] The Government conceded this was a custodial interrogation. We are aware of no case that supports a finding that significant attenuation occurs from a mere 33 minute delay while continuously under Government escort.

In conducting our de novo review of the voluntariness of Appellant's statements, we are convinced that three separate, but related, factors worked together to overcome Appellant's will notwithstanding his age, education, experience, and intelligence. First, as Appellant's Regimental XO, LtCol Hill, held great authority—by rank and billet—over Appellant, which gave significant

---

[80] R. at 159.

[81] *See, e.g., Bubonics*, 45.M.J. at 95 ("The necessary [voluntariness] inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker. If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process.") (citation omitted).

[82] R. at 31.

[83] App. Ex. XXII at 2.

[84] Pros. Ex. 4.

force to his directive to "[not] squirrel around, just answer their questions."[85] Second, prior to the custodial interrogation, the lead agent undermined the rights advisement—portraying it as a mere formality, "just a piece of paper"—and misled Appellant by saying he was not accused of any crime and was only being interviewed to obtain information.[86] Third, by referring, no less than 11 times, to their need to report to Appellant's command, the agents underscored and amplified the coercive effect of LtCol Hill's directive to answer their questions.[87]

Appellant's age, difficult undergraduate studies, standardized test scores, and experience as a Marine Corps officer—while certainly part of voluntariness analysis—are insufficient to convince us his statements were voluntary. Likewise, within the context of the facts here, reading and initialing a rights advisement document portrayed as a "just a piece of paper" does not render what would be an otherwise involuntary confession voluntary.[88]

Thus, under the totality of the circumstances, Appellant's capacity for self-determination was critically impaired and his will was overborne. His statements to NCIS were involuntary and inadmissible.

### *3. Prejudice*

"Constitutional errors are reviewed for harmlessness beyond a reasonable doubt."[89] The erroneous admission of evidence is not harmless beyond a reasonable doubt if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction."[90] "This determination is made on the basis of the entire record, and its resolution will vary depending on the

---

[85] R. at 136.

[86] Pros. Ex. 4; App. Ex. XXXVI at 11.

[87] We do not hold that it is per se improper for law enforcement agents to refer to their need to report to an accused's command, or that doing so—without more—would have been sufficient to convince us that Appellant's will was overborne. Our conclusion here is limited to the unique facts of this case and the compounding effect of the factors bearing on Appellant's will.

[88] Pros. Ex. 4; App. Ex. XXXVI at 11.

[89] *United States v. Mott*, 72 M.J. 319, 332 (C.A.A.F. 2013) (citation omitted).

[90] *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

facts and particulars of the individual case."[91] Erroneous admission of a confession "requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless."[92]

Having previously found that Appellant suffered prejudice under the lesser nonconstitutional harmlessness test, we now find, on the basis of the entire record, that the improper admission of Appellant's statements to NCIS was prejudicial under the harmless beyond a reasonable doubt test.

## III. CONCLUSION

After careful consideration of the record, briefs of appellate counsel, and informative oral argument, the findings and sentence are **SET ASIDE**. A rehearing is **AUTHORIZED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[91] *United States v. Sweeney*, 70 M.J. 296, 306 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 69 M.J. 218, 226–27 (C.A.A.F. 2010)).

[92] *Fulminante*, 499 U.S. at 296.